IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

---

Stephen J. Komorek
API International Consulting Group, Inc

                  Plaintiffs

                                          Civ. No. __2:24-cv-1227__

-against-                               **VERIFIED COMPLAINT**
                                           Jury Trial Demanded

Conflict International, Inc.; Michael LaCorte in official capacity as sole incorporator and CEO of
Conflict International, Inc,(aka: Michael La Corte, Mike Lacorte, Michele LaCorte, Michele La
Corte);Michael Tapling; Joseph Hill; Andrew McLaren;
Victoria Pressly (aka Vicky Pressly, Victoria Talbot);
JW Bearden & Associates PLLC; Bearden Investigative Agency;
James Wesley Bearden (aka, Wes Bearden);
Michael Thompson (aka Mike Thompson); World Association of Detectives, Inc.;
Robert A. Heales as Executive Direct of World Association of Detectives; Does 1-10

                  Defendants

---

Plaintiff, Stephen J. Komorek, complaining of Defendants Conflict International, Inc.; Michael

LaCorte in official capacity as sole incorporator and CEO of Conflict International, Inc,

(aka: Michael La Corte, Mike Lacorte, Michele LaCorte, Michele La Corte); Michael Tapling;

Joseph Hill; Andrew McLaren; Victoria Pressly (aka Vicky Pressly, Victoria Talbot);

JW Bearden & Associates PLLC; Bearden Investigative Agency; James Wesley Bearden (aka,

Wes Bearden); Michael Thompson (aka Mike Thompson); World Association of Detectives,

Inc.; Robert A. Heales as Executive Direct of World Association of Detectives;

Does 1-10, all sometimes referred to individually as "Defendant" and collectively as

"Defendants", alleges, as follows:

**NATURE OF THE ACTION**

1.   This is an action for civil damages under the Racketeer Influenced and Corrupt

Organizations Act (18 U.S.C. § 1961 et. Seq.) ("RICO"); for civil damages under the Privacy

Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); for civil damages under

the following: for False Statements 18 U.S.C. 1001; for Mail Fraud 18 U.S.C. 1341;  for Wire

Fraud 18 U.S.C. § 1343;for Perjury 18 U.S.C. 1621; for Unsworn Declarations Under Penalty of

Perjury 28 U.S.C. 1746; for Common Law Unfair Competition: for Fraud: for Trade Libel; for

Libel Per Se; for Injurious Falsehood; for Tortious Interference With Existing Business

Relations; for Tortious Interference With Prospective Business Relations/Economic Advantage;

for Intentional Infliction of Emotional Distress; for Unreasonable Intrusion Upon Seclusion; for

Prima Facie Intentional Tort; for punitive and exemplary damages for Defendants' culpable

conduct as described in this Complaint.

**PARTIES**

2.    Plaintiff Stephen J. Komorek is an individual, personally resides and maintains his

 principal place of business within the State of Ohio.

3.   API International Consulting Group, Inc., is incorporated in Ohio with a registered

address within this District.

4.   API and/or Stephen J. Komorek are licensed as Private Investigators within the State of

Ohio, North Carolina and New York and conducts business within these Districts.

5.   Defendant Conflict International, Inc., is a New York Domestic Business Corporation

headquartered in the State of New York, which on information and belief, is an entity used by

Defendant Michel LaCorte to conduct private investigation and other business services in the

State of New York and though branch offices throughout the United States, including the State of North Carolina.

6. Michael LaCorte, upon information and belief, is the sole incorporator and CEO/President of Conflict International, Inc., and, is a citizen and resident of the United Kingdom. Upon information and belief, LaCorte owns residential property in the State of New York, is systematically travelling to and conducting business for Conflict International, Inc., in the State of New York and North Carolina, and other states – including with a partner private investigation firm within the District of New York, and, on information and belief, LaCorte possesses a United States Visa.

7. Defendant Michael Tapling, upon information and belief, is a citizen and resident of the State of North Carolina and, except as otherwise provided, was at all relevant times an employee of Conflict International, and acting with the assent, for the benefit and/or under the control of Conflict International, Inc., by and through Mike LaCorte or his agents.

8. Joseph Hill, upon information and belief, is a citizen and resident of the State of North Carolina and, except as otherwise provided, was at all relevant times an employee of Conflict International, Inc., and acting with the assent, for the benefit and/or under the control of Conflict International, Inc., by and through Mike LaCorte or his agents.

9. Andrew McLaren, upon information and belief, is a resident of the State of Tennessee and, except as otherwise provided, was at all relevant times acting with the assent, for the benefit and/or under the control of Conflict International, Inc.

10. Victoria Pressly, upon information and belief, is a resident of the State of New York, and, except as otherwise provided, was at all relevant times acting with the assent, for the benefit and/or under the control of Conflict International, Inc.

11. JW Bearden & Associates PLLC, upon information and belief, is a State of Texas Professional Limited Liability Company, headquartered in the State of Texas, with an office in Louisiana, and, except as otherwise provided, was at all relevant times acting with the assent, for the benefit and/or under the control of Conflict International, Inc.

12. Bearden Investigative Agency, upon information and belief, is a State of Texas Domestic Corporation, headquartered in the State of Texas, with an office in Louisiana, and, except as otherwise provided, was at all relevant times acting with the assent, for the benefit and/or under the control of Conflict International, Inc.

13. James Wesley Bearden, upon information and belief, is a citizen and resident of the State of Texas and, except as otherwise provided, was at all relevant times acting with the assent, for the benefit and/or under the control of Conflict International, Inc.

14. Michael Thompson, upon information and belief, is a citizen and resident of the State of Texas and, except as otherwise provided, was at all relevant times acting with the assent, for the benefit and/or under the control of Conflict International, Inc.

15. World Association of Detectives, Inc, is a Nevada Non-Profit Organization, headquartered in the State of Colorado, which on information and belief, except as otherwise provided, was at all relevant times acting with the assent, for the benefit and/or under the control of Conflict International, Inc.

16. Robert A. Heales, upon information and belief, is a citizen and resident of the State of Minnesota, and, except as otherwise provided, was at all relevant times acting with the assent, for the benefit and/or under the control of Conflict International, Inc.

17. Plaintiff is ignorant of the true names and capacities of the Defendants sued in this

Complaint as Does 1-10, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities of Doe Defendants when ascertained. Each of the fictitiously named Defendants is responsible in some manner for the conduct alleged in this Complaint, and Plaintiff's damages are actually and proximately caused by the conduct of such Defendants.

18. Based  upon information and belief, Plaintiff alleges that at all times mentioned herein, each Defendant listed in paragraphs 1 through 17, inclusive and as if rewritten herein, were each employed by, consultants to, or acting as agents of, and/or for the benefit of, and/or were co-conspirators of, Defendants Conflict International, Inc and/or Michael LaCorte, and each was acting as agents of, and/or employee, and/or co-conspirator of each other, in the course or scope of their agency with one another, with full knowledge, and/or permission, and/or consent, and/or implied consent of each other.

## JURISDICTION AND VENUE

19. This court has original jurisdiction over Plaintiff's Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et. Seq.) ("RICO"); for civil damages under the Privacy Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); for civil damages under the following: for False Statements 18 U.S.C. 1001; for Mail Fraud 18 U.S.C. 1341; for Perjury 18 U.S.C. 1621; for Unsworn Declarations Under Penalty of Perjury 28 U.S.C. 1746; for Prima Facie Intentional Tort claims pursuant to 28 U.S.C. §1331, as well as pursuant to 28 U.S.C. §1332, as the claims in this action reflect a matter in controversy that exceeds $75,00.00, and the plaintiff is in complete diversity.

20. This Court has supplemental jurisdiction over Plaintiff's state law and common law

claims pursuant to 28 U.S.C. § 1367(a), which claims are so related to Plaintiff's federal claims as to form part of the same case or controversy.

21. In particular, Stephen Komorek is a resident and citizen of the State of Ohio, his company, API International Consulting Group, Inc, is a duly formed and in good standing Ohio corporation, headquartered in Columbus, Ohio and there is clear diversity among the parties, and Conflict International, Inc., is a citizen of the State of New York, Michael LaCorte while a resident of the UK, is the sole incorporator of Conflict International Inc, owns residential property in the State of New York, holds a United States Visa and is a Director of the US incorporated World Association of Detectives, State of Nevada; Michael Tapling and Joseph Hill are residents and citizens of the State of North Carolina; Andrew McLaren is a resident and citizen of the State of Tennessee; Victoria Pressly is a resident and citizen of the State of New York; JW Bearden & Associates PLLC, Bearden Investigative Agency, are citizens of the State of Texas; James Wesley Bearden is a resident and citizen of Texas; Michael Thompson upon information and belief is a resident and citizen of the State of Texas; World Association of Detectives, Inc, is a citizen of the State of Nevada; Robert A. Heales as Executive Direct of World Association of Detectives is believed to be a resident and citizen of Colorado; Does 1-10 whereabouts are not known to Plaintiff.

22. Venue is proper in the Southern District of Ohio, Eastern Division, under, inter alia, pursuant to 28 USC §1965(a) because Plaintiff is found here, and to have a registered agent or transacts their affairs in this District. Venue is proper under 28 U.S.C. §1391(a) and (b)(3), because a substantial part of the events or omissions by Defendants giving rise to the claims occurred in this District. Venue is also proper under the principles of pendent venue because all claims arise out of the same nucleus of operative facts. Finally, venue is proper under section

1965(b) in this forum because the ends of justice require that any Defendant residing in another District be brought before this Court.

## <u>INTRODUCTION</u>

23. Plaintiff Stephen J. Komorek ("Komorek") is the Founder and CEO of API International Consulting Group, Inc ("API"), a duly formed State of Ohio corporation, with its main address being 175 S. Third St, Suite 200, Columbus, OH 43215. (see Exhibit 1)

24. Plaintiff Komorek and/or API are duly licensed to provide Private Investigation services in Ohio, North Carolina and New York. (See Exhibit 2)

25. API is also registered as a Foreign Corporation to conduct lawful consulting business in North Carolina, New York, Florida, Colorado and Pennsylvania. API was previously registered to do lawful business in California, but has cancelled that registration effective the close of business December 31, 2023, which will be more fully detailed herein.

26. Plaintiff Komorek brings this action against his former employer, Conflict International, Inc (CI) and Michael LaCorte, in his capacity as the sole incorporator and CEO of CI, now competitor in the Private Investigations and Consulting sector and their agents, associates, co-conspirators and those persons or entities who they used and/or uses as their instrumentalities, each of whom is responsible in some manner for the conduct alleged in this Complaint and Plaintiffs damages as more fully detailed herein.

27. The genesis of this case begins in 2018, when the Plaintiff was in the employ of Abacus Research, in North Carolina. While working for Abacus, the Plaintiff was approached by Defendant LaCorte, at an investigations trade/industry event and solicited Plaintiff to join Conflict International, Inc.

28. After discussions with the executives at Abacus, a trial loan period for Komorek to work

with CI was arranged. (See Exhibit 3) This resulted in a full time job offer to Komorek and he accepted in 2019.

29. Upon joining CI, it was being led by Sinai (sic) Megibow. Megibow shortly thereafter resigned and Komorek became the sole US employee of CI.

30. CI gross income, upon information and belief, at the time Komorek joined CI were approximately $81,000.00 USD. Due to the diligence, hard work and leadership of Komorek, the revenues grew to approximately $2.2 million USD by the end of 2021. Under Komorek the office grew to over 7 full time employees, with a fully staffed office in Greensboro, NC.

31. During this time period, 2019 through 2021, Komorek went from being a salaried employee to an at will employee with a base monthly paycheck and bonuses. While Komorek was given a Management/Administrative job title ranging from Director, to Director of US Operations and at the time of resignation, he was classified as Senior Vice President of US Operations (See Exhibit 4), he was never an Officer or Director of Conflict International nor given actual management authority of the US enterprise.

32. Upon information and belief, there were no Corporate Minutes or Record in any US office and Komorek was never issued shares or other evidence of ownership or corporate authority in the company. Rather, all corporate decisions had to be approved by LaCorte, including all personnel matters, including hiring, discipline and termination.

33. While CI was formally incorporated as a New York state entity, with LaCorte as the sole incorporator, it had all the appearances to Komorek of being operated as a sole proprietorship from the UK. (See Exhibit 5)

34. It was also during this time that Komorek began to question several business practices of CI, such as LaCorte and Conflict International LTD, (UK based company) personnel were

8

soliciting business in the US and were not authorized by law or licensed to do so. (See Exhibits 6-7)

35. Komorek raised concerns with LaCorte about CI (UK) providing support and investigation services to Russian banks and oligarchs living in Cypress. Such services were believed to be in violation of US law, and Komorek was concerned that LaCorte as CEO of CI (US) would get CI (US) in trouble. (See Exhibits 6-7)

36. Additionally, Komorek raised some issues with what he believed were questionable accounting practices by an outside US accountant retained by LaCorte. (See Exhibits 6-7)

37. Finally, Komorek had repeatedly requested for specific job descriptions, roles, authority and an Employee Manual be developed and distributed to all staff. Each of these concerns and requests were either ignored by LaCorte or Komorek was told, in essence, to mind his own business and stay in his lane. (See Exhibits 6-7)

38. From the beginning of Komorek's employment with CI, LaCorte, corporately and personally, knew Komorek was a 100%, total and permanent, disabled combat Veteran of the US Army. Over the course of the above noted employment, Komorek had shared some of his disabilities with LaCorte and other agents, employees of CI. (see Exhibit 8)

39. On several specific occasions LaCorte engaged in behavior towards Komorek in front of other staff members, friends and associates of CI, that Komorek brought to his attention, advising they were both unwarranted and triggering events in relationship to his Post Traumatic Stress Disorder.

40. In December, 2021, one such event occurred and Komorek advised LaCorte if it ever happened again he would quit the company immediately.

41. The next event occurred on or about Feb. 25, 2022, during a weekly joint senior management video conference of CI (US) and CI (UK) personnel. It was later that evening that Komorek emailed LaCorte and the US staff of his immediate resignation from the company. (Exhibit 9)

42. Inasmuch as there was no Employee Handbook, Employment Contract or Non-Competition Agreement in place between Komorek and CI, Komorek immediately stood up his new company in Columbus, Ohio and created a strategic management plan to start from scratch and grow his own investigation and consulting business.

43. In spite of the unpleasantness of the separation from CI and with LaCorte in particular, Komorek voluntarily engaged in an extensive transition, "handover" of information, files, procedures and protocols to both CI (US) and CI (UK) staff members. Komorek crafted and delivered a Standard Operation Manual that included the above, along with logins and passwords for critical accounts/functions for the US staff to use to carry on the management activities Komorek had faithfully executed. (See Exhibit 10)

44. Finally, Komorek had created an "auto reply" to any incoming email messages on his CI email account that he was no longer with the company and inquiries should be directed to Michael Tapling, with Tapling's email and phone number included. (See Exhibit 11)

45. In the coming weeks after his resignation, Komorek, unsolicited, was contacted by two clients, expressing their dissatisfaction with CI since his departure and requesting he and his new company provide ongoing investigative and consulting services. Komorek consulted legal counsel, and upon their advice agreed to accept the request for services. (See Exhibit 12)

46. Shortly thereafter is when CI and LaCorte, along with their co-conspirators, motivated by a deep seated desire to retaliate against Komorek, in their own words, because "Komorek

10

obtained clients of Conflict International causing certain unknown financial damage to Conflict International", launched a culpable enterprise, through a pattern of racketeering, by inter alia, committing numerous criminal acts of mail and wire fraud, as well as other predicate acts that are more fully set forth herein, in a way which proximately has, and continues to, cause injury to the Plaintiff.(see Exhibit 13 Ethics Complaint filed by CI and LaCorte, et al to the World Association of Detectives)

47. Conflict International, by and through Michael LaCorte and their co-conspirators sought to injure Komorek and his business by, among other things:

48. Attempting to obtain Komorek's Military Medical Records by fraudulently submitting a Form 180, signing the Authorization Signature line purporting the signature to be that of Komorek, in violation of the Privacy Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); False Statements 18 U.S.C. 1001;  Mail Fraud 18 U.S.C. 1341; and for Unsworn Declarations Under Penalty of Perjury 28 U.S.C. 1746.

49. Filing a false and libelous Ethics Complaint to the World Association of Detectives, of which Komorek was a Member and Board Member, solely for the purpose of having Komorek suspended from the Board and expelled from the organization in order to cause injury to his personal and professional reputation and to cause him deprivation of property and economic harm in violation of Common Law Unfair Competition: Fraud; Trade Libel; Libel Per Se; and Injurious Falsehood.

50. Contacting a newly acquired former client of CI and libeling/slandering Komorek in an effort to get the client to leave Komorek in violation of Common Law Unfair Competition: Fraud; Trade Libel; Libel Per Se; and Injurious Falsehood and Tortious Interference With Prospective Business Relations/Economic Advantage.

51. Contacting a subcontractor Komorek had hired to conduct interviews on behalf of the same newly acquired client and engaged in libelous/slanderous behavior in order to get the subcontractor to cancel his engagement with Komorek, in violation of Tortious Interference of Existing Business Relations.

52. As a result of the false Ethics Complaint above, and sharing the details of the Complaint with third parties, the ongoing negotiations by Komorek to acquire an out of state licensed Private Investigation company were permanently broken off by the company, specifically citing the nature and details of the complaint against Komorek, in violation of Tortious Interference of Future Business Relations.

53. Filing lawsuits in state and federal courts against Komorek on false claims and committing perjury in connection with said filings, for the sole purpose of disparaging Komorek in the public arena.

54. Through Defendants' illegal and tortious acts as herein set forth, Plaintiff has been denied valuable business opportunities, has suffered damage to his business and property, and has suffered irreparable harm to his personal, professional and business reputation and goodwill.

## **RELATED CASE**

55. This case is related to Stephen Komorek and API International Consulting Group, Inc v. Conflict International, Inc, Michael LaCorte and Andrew McLaren, Case No. 22-cv-09467-ER, in the United States District Court, Southern District of New York, which was initiated by Komorek and API against Conflict International, LaCorte and McLaren for Violation of New

York Labor Law §740, and two counts of Libel (Ohio Law) and prior to learning of the extensive conspiracy to ruin the reputation and business of Plaintiff.

56. Rather than filing an Answer and/or Counterclaim against Komorek, Conflict International, Inc., filed a variety of Motions, to date, none of which has been ruled upon by the Court. Then Conflict International, Inc., additionally filed a law suit as Conflict International, Inc (US company) and Conflict International, Ltd (United Kingdom company) v. Stephen Komorek and API International Consulting Group, Inc, in the United States District Court, Southern District of New York, 2023cv02165, for the sole purpose of putting Komorek and API in a negative light as Defendants in a federal lawsuit and to deflect from the original lawsuit filed against them by Komorek and API. Their false and frivolous accusations in the new suit are more in line with answering the complaints made by Plaintiffs in their suit against them. Plaintiffs believe the Court would find this to be an Abuse of Process designed solely to injure the Plaintiffs, economically, personally and professionally, especially in relation to their reputation. Evidence of same will be further explained herein.


## FACTS COMMON TO ALL COUNTS


57. On or about March 9, 2020, Matthew Parker, a then subcontractor to Conflict International was terminated by Komorek due to learning of Parker's alleged criminal behavior towards a female employee of CI. Said employee later obtained a NC 50B Restraining Order against Parker.

58. On or about March 9, 2020, based upon information and belief, Parker, immediately after being terminated by Komorek, directly contacted Michael LaCorte, advising him that Parker had

first -hand knowledge that could affect his company's reputation within the investigation industry, and he would therefore be terminating any and all contact with Conflict International, both US and UK. Upon information and belief, Parker advised he would be sanitizing all evidence of contact with CI, and suggested CI do the same.

59. Shortly after this contact, Parker sent LaCorte a multiple page "Investigative Report", wherein he alleged his investigation revealed among other things, the following:

60. "concerns us considering his (sic Komorek's) appearance on Ft. Bragg and other installations, his attending of AUSA and other military conferences and events to market his "intelligence services.", "his claims of working with the US Secret Service, FBI, CIA, Anti-human trafficking and organized crime task forces bring questions as to….." "Based on his NGB22 military service records (attached) Mr. Komorek's stated military and government service has been greatly and fraudulently exaggerated and we determined it is with the knowledge." "When questioned about these discoveries Conflict and Mr. Komorek began an effort to purge social media and the company web site of exaggerated claims." Komorek, "Impersonated a former military intelligence specialist to a US Army National Guard Battalion, offering to "observe and teach" battalion soldiers of the S-2 or intelligence section. His behavior was so egregious he was asked to leave and the unit did a review of his military background discovering his true past. He was reported to the unit Security Manager for his actions." (See Exhibit 14)

61. As a result of receiving this letter, LaCorte confronted Komorek with the allegations and showed him the "Investigative Report". Komorek was never given a copy of the report and can only produce copies of correspondence between various Defendant co-conspirators who used

said contents in an effort to injure and damage Komorek's reputation and cause him economic harm. (See Exhibit 14)

62. LaCorte then launched his own investigation of the allegations and Komorek fully cooperated, including producing his entire Military Records, excepting his Medical Record. These Military Records were then kept in Komorek's permanent Personnel File.

63. After a complete and thorough investigation by LaCorte, a Cease and Desist Letter to Matthew Parker, was crafted and sent to Parker and his company, Independent Security Advisors, LLC on May 15, 2020, by attorney Jason Pfister, Forrest Firm, PC. ( See Exhibit 15) Included in that letter, a copy of which was shared with Komorek and the female employee accosted by Parker, were the following:

64. "Accused Mr. Komorek of committing multiple criminal acts, including telling Chuck Simpson that Mr. Komorek had threatened to commit violence against Ms. Reed if she ever left her employment with Conflict International and also accusing Mr. Komorek of falsifying or embellishing his military background in violation of the Stolen Valor Act of 2013. See 18 U.S.C. §704 et al."

65. "Made false statement to Joe Teti that you were conducting an "official investigation" into Mr. Komorek on behalf of Independent Security Advisors, LLC. You falsely mispresented to Mr. Teti that you were conducting this investigation on behalf of a third party, Independent Security Advisors, LLC, when in fact you were only contacting Mr. Teti on your own behalf in order to harass and defame Mr. Komorek and Ms. Reed."

66. "Conflict International has also learned that additional false information, in addition to the statements listed above, relating to Ms. Reed and Mr. Komorek's prior employment and

conduct is being disseminated in the professional community presumably in an effort to malign their character and disparage them in their profession."

67. "These and other activities currently under investigation, constitute unlawful conduct in violation of a number of laws and may subject you to civil liability for multiple claims, including but not limited to harassment, defamation, tortious interference with an existing contract, tortious interference with a prospective economic advantage, fraudulent misrepresentation, unfair competition, and unfair and deceptive trade practices."

68. It is this very letter from 2020 that Defendants CI and LaCorte rightly condemned as harassment, defamatory, tortious, fraudulent misrepresentations, unfair competition, and unfair and deceptive trade practices that has now been resurrected and disseminated by and through Defendant CI and its co-conspirators in an effort to malign, harm and injure the Plaintiffs, among additional culpable acts that will be detailed herein, that is common to the conspiracy of the various Defendants.

69. LaCorte and other co-conspirators have actual knowledge Komorek indeed has had a long standing and ongoing working relationship with the US military and other US agencies/entities:

70. At Komorek's invitation, LaCorte was granted permission to attend a non-classified debriefing given by Komorek, as Team Leader, to a variety of Special Operations leaders on base at then Fort Bragg, NC, in November, 2021. LaCorte and other CI employees attended such meetings on Fort Bragg at Komorek's request. All had personal knowledge of Komorek's professional intelligence working relationship with members of a Special Working Group at Fort Bragg

71. Komorek utilized his various contacts in US agencies to aid in getting a wrongfully imprisoned US citizen out of a Chinese prison, in 2018, a case started by Komorek while working at Abacus and concluded while on loan to Conflict. (See Exhibit 16)

72. Komorek utilized his various US military contacts in a Conflict case involving the USAF and the Department of Defense, involving a US military base incident in the Far East.

73. Komorek assisted US government intelligence agencies in Conflict file #MS0920, which culminated in the arrest of the suspect in 2024. In fact, Conflict UK offered any assistance needed with their overseas contacts.

74. Defendant Conflict International, Inc, directly and through Defendant Michael LaCorte and the other named Defendant co-conspirators, pursued their criminal enterprise through a pattern of racketeering activity affecting interstate commerce for the sole purpose of causing harm and damage to Komorek, and injuring Komorek's business relationships, reputation and economic opportunity, with the goal of destroying Komorek's business, personal and professional reputation in the investigation and consulting industry and causing Komorek significant monetary and emotional damage. The details of which are recited herein.


**FIRST PREDICATE ACT**

**Criminal Violations of the Privacy Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); False Statements 18 U.S.C. 1001; for Mail Fraud 18 U.S.C. 1341; for Perjury 18 U.S.C. 1621; for Unsworn Declarations Under Penalty of Perjury 28 U.S.C. 1746 as and against Defendants Conflict International, Inc., by and through Michael LaCorte; Defendant James W. Bearden; Defendant JW Bearden & Associates PLLC; Defendant Bearden Investigative Agency; and Defendant Michael Thompson.**

75. On or before April 12, 2022, Defendant and Principal of the RICO enterprise, Conflict International, by and through LaCorte, retained attorney Defendant James W. Bearden (aka Wes Bearden) and his law firm Defendant JW Bearden & Associates PLLC, "Due to several discovered issues, Conflict requested my firm prepare and draft, on their behalf, an ethics complaint against Mr. Komorek with the World Association of Detectives, Inc. ("the WAD"). (See Exhibit 17 letter from Wes Bearden to Office of the Chief of Disciplinary Counsel, Dec. 6, 2022 RE: Complaint 202207022).

76. On or before April 12, 2022, Defendant JW Bearden & Associates PLLC retained Defendant Bearden Investigative Agency and Defendant Michael Thompson to "determine the extent to which Mr. Komorek made misrepresentations to my Client regarding his previous employment and military service." (ibid)

77. On or about April 12, 2022, Defendant Michael Thompson executed Form SF180.

78. The Form SF 180 completed and signed by Thompson clearly shows checked boxes under Section II , 1 including: DD Form 214; Official Military Personnel File (OMPF); Medical Records and Other (typed in "Final duty status, final rank, salary, transcript of any court martial trials). (See Exhibit 18)

79. Also checked under Section II, 2, Purpose is the following: Employment and Other (typed in "To validate claims made to employer during employment.") (ibid)

80. In Section III, 2 Relationship to Veteran, is typed No Relation to the Veteran, and box Other is checked with typed in, "Investigator". (ibid)

81. In Section III, 5 Authorization Signature, Thompson provided an illegible signature. Above the signature line the form clearly states the following declaration: "**I declare(or certify,**

**verify, or state) under penalty of perjury under the laws of the United States of America that the information in this section III is true and correct and that I authorize the release of the requested information.** (See items 2a or 3a on accompanying instruction sheet. Without the authorization Signature of the veteran, next -of-kin of deceased veteran, veteran's legal guardian, authorized government agent, or other authorized representative, only limited information can be released unless the request is archival. No signature is required if the request is for archival records." )" (ibid)

82. Komorek is the veteran in question on the form and did not sign the form, is not deceased and he does not have a legal guardian. Thompson is not an authorized government agent, or other authorized representative for Komorek.

83. This form was mailed, via USPS to Department of Veterans Affairs, ATTN: Release of Information, Claims Intake Center, PO Box 4444, Janesville, WI 53547-4444. This is actually the address of the VA Compensation Intake Center – an office which does not handle personnel or medical records matters. (See Exhibit 19)

84. On page 2 of the Instruction Sheet for SF180, it clearly lists the addresses for Army Personnel Records and Medical or Service Treatment Records. Nowhere on the lists of addresses for all branches of the military, pg2 of the Instruction Sheet, does the WI address appear.

85. The VA Compensation Intake Center forwarded the SF180 to the proper office that handles Medical/Treatment request – because Thompson checked the box for release of Medical Records in Section 2 of Form SF 180. (See Exhibits 18, 19)

86. April, 26, 2022 The office in St. Louis received and processed the request and sent Komorek a cover letter and requested items, minus the Personnel File, believing he had signed the Authorization line, therefore he was the requester. (ibid)

87. The VA letter, dated September 26, 2022, to Komorek, states, "This is in response to your Privacy Act request dated April 26, 2022. We have provided you with the following

record(s): Military Separation Document(s), Official Military Personnel File, and Service Treatment Records." (ibid)

88. Inasmuch as the Form 180, Privacy Act request completed and signed by Defendant Thompson indicates the same records sent to Komorek were to be sent to him, at his office in Texas, Plaintiff has reason to believe the records were indeed sent to Thompson and were obtained by Thompson in violation of the Privacy Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); False Statements 18 U.S.C. 1001; for Mail Fraud 18 U.S.C. 1341; for Perjury 18 U.S.C. 1621; for Unsworn Declarations Under Penalty of Perjury 28 U.S.C. 1746.

89. If the documents were not sent to Thompson, then his actions were an attempt to obtain same in violation of the Privacy Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); False Statements 18 U.S.C. 1001; for Mail Fraud 18 U.S.C. 1341; for Perjury 18 U.S.C. 1621; for Unsworn Declarations Under Penalty of Perjury 28 U.S.C. 1746.

90. As a result of Defendants conduct herein, Plaintiff has suffered emotional distress that has required medical intervention.

## SECOND PREDICATE ACT

**Criminal Harassment by Telecommunication Device in violation of State of Kansas, Uniform Public Offense Code 9.10 (see attached Conviction Journal Entry, Municipal Court of Leawood, KS, Case #22-MD-160571); and/or in violation of 18 U.S.C. 2261A, Stalking; and/or in violation of New York Statute 240.26, Harassment; and Tortious Interference With Existing Business Relation.**

91. Over a period of months, Defendant Pressly sent the victim in Municipal Court of Leawood, KS, Case #22-MD-160571, by telecommunication devices, in violation of state and

Federal laws, numerous messages that qualified as criminal harassment, both in quantity and content.

92. The following is a summary of facts/circumstances/communications that commenced on or about Feb. 24, 2022, between Trudy Jacobson, Victoria Pressley, and Andrew McLaren and refer to Stephen Komorek and or Conflict International:

93. Feb. 24, 2022: Text from Pressly to Jacobson, alleges Komorek had cheated Andrew McLaren out of 10% commission on all the work Komorek and Conflict International were doing on her behalf. McLaren is the party who introduced/referred Jacobson to Komorek and Conflict in 2021 for a matter involving possible extortion by an individual in NYC, where Jacobson maintains a second home. Jacobson asked Pressly who gave her this info, and she advised Andrew McLaren.

94. March 2022

95. March 25th text from Pressly to Jacobson (Note Jacobson is now a client of API International Consulting Group, Inc.):

96. 0737 am " What are you doing? Why is Mike from Conflict asking me for calls and telling me Stephen left an open invoice in your name close to $100,000 in work? Are you partners and backing Stephen's new business? He left so many unpaid bills in your name and said you were not paying yet? Work he ordered and never paid people? Are you aware of any of this mess? Why is this happening? They said he posted he a Philanthropist like you have posted on your page? What did Stephen do? My God."

97. The mention of this "outstanding invoice" by Pressly upon information and belief was communicated to Pressly by Andrew McLaren , was for over $112,000. The disclosure of this information was made three days before an actual invoice was prepared by Michael Tapling,

Conflict International Director of US Operations and later provided to James Wes Bearden, JW Bearden & Associates PLLC, 1341 West Mockingbird Lane, Ste 820W, Dallas, TX 785247.

98. The actual invoice was dated March 28 and transmitted to Mrs. Jacobson's lawyer's office via email on 4/6/2022, by attorney, J. Wes Bearden, JW Bearden & Associates PLLC, 1341 West Mockingbird Lane, Ste 820W, Dallas, TX 785247.

99. This invoice has been determined to be fraudulent, as the actual work performed by Conflict International totaled less than $40,000.00, and the accurate invoice reflecting this amount had been transmitted to Jacobson prior to the resignation of Komorek from Conflict International, Inc.

100. Upon counsel's advice, this grossly padded invoice has not been paid by Jacobson, even though Bearden has made attempts to collect same since being advised by counsel the invoice is not correct.

101. March 29th multiple emails (4:27am, 5:09am, 5:12am,5:21am, 1:12pm7:00pm) from Pressly to Jacobson justifying being paid for all the work she has done on behalf of Jacobson and Sergio. Pressly repeatedly makes reference to allegations of misconduct by Komorek while at Conflict and tells Jacobson to contact "Mike".

102. March 30, 2022: Cease and Desist Letter issued to Victoria Talbot/Pressly and Andrew McLaren by Jacobson's attorney in New York.

103. April 2022

104. April 1, 2022 3:52am, Andrew McLaren sends email to Pressly, Subject: Should you send this to Trudy from me? Content contains letter from McLaren.

105. At 0:45am, Pressly forwards McLaren's Letter to Jacobson. Letter claims Komorek failed to pay McLaren his 10% commission on monies paid to Komorek/Conflict

International from Jacobson, and that he, McLaren, terminated his business relationship and friendship with Komorek since he did not keep his word.

106.     April 1, 20222 1:20pm, email to Jacobson from Pressly. Subject: It was you I trusted and loved. Accuses Jacobson of putting Pressly in the middle of Jacobson's drama. "Stephen, Conflict International and Andrew have massive issues over money over your account which also was not my drama. He fired me and sent so many threatening messages to me regarding messages Stephen sent to Conflict which I also saw and read about me and you didn't back me up and I was in the middle you and your drama."

107.     May 2022

There are 32 emails over a period of 12 days

108.     May 11th, from 9:47am to 10:48am there are 2 emails.

109.     The first is referring to a recently published article in Law Enforcement Today, an online newspaper for law enforcement and Pressly defends herself from the contents of the article. She claims Jacobson and Komorek authored the post.

110.     May 12th, between 8:21pm to 9:25pm there are 4 emails.

111.     The first email at 8:21pm, Subject line is request to "just talk and have a conversation please". The body of the email contains 5 numbered paragraphs. They range from Pressly expressing how "I love working with you! Talking with each other, miss you.", to being critical of Stephen, Andrew and Sergio, calling them (Stephen and Andrew), "drama queens', Sergio "damaged" and Stephen "out of control" Paragraph 5 closes with Pressly stating, "please let's just stop all this I really liked you and miss you."

112.     May 19th, There are 2 emails, 10:08am and 10:12am, accusing Jacobson of posting negative reports on a website called Rip Off Reports. Tells Jacobson to get a life, nobody

cares and that Jacobson and Stephen need to stop. Also accuses Jacobson of "paying Stephen $30,000 give or take a month for Rip Off Reports."

113.     Upon information and belief, it was really Pressly who created the reports and then later placed the blame on the Plaintiff and Ms. Jacobson.

114.     June 2022

115.     June 7th, there are 2 emails , 3:41pm and 3:43pm.  The first, Subject line, "I'd like to resolve any issues." The body goes on to state Pressly wants to work things out, thought they had a great relationship.  She repeats claim that Komorek owes Andrew $40,000, and instead smeared her. She goes on to claim Komorek disclosed confidential information from a business consultation she had with Andrew and Komorek in Miami, regarding a civil lawsuit she was named in, in NY, which was later dismissed. Claims Komorek was part of the team that was supposed to defend her in that suit.

116.     June 26th, there are three emails 10:22 pm, 10:25pm and 10:33 pm, all related to same topic, but with a mixture of recipients.

117.     10:22pm, Subject line, "Stop Involving Me" and changes the Subject line to "Stop involving me in your defamation"", Sent TO: kfm@mccallionlaw.com; itstherbf@aim.com; mrdaveyLA@yahoo.co.uk; Jacobson and andrewmclaren008@gmail.com

Body of message: Pressly "got call from Melissa prophet and Gretchen Bonaduce that Trudy, Stephen and Davey have put together a fake fraud case about me. I'm not involved in Trevor's and Trudy's case about their sex trafficking and hired escort for sex contract." "Trudy's detective called my clients and said I pissed off a rich lady and she is out for revenge. Her detective John said he had a list of people to call and question who all basically said it is a ridiculous case. Trudy has a fatal attraction against Trevor and Stephen her detective is making up false

investigation to get money out of her. Leave me out of your equation. I don't want to be involved."

118.     The above are just summaries of emails mentioning Plaintiff and falsely accusing him of various wrongful acts. There are many more emails and all combined served as the foundation for and evidence in criminal charges being filed against Pressly in Leawood, KS, with Jacobson as the victim of the harassment.

119.     Pressly was convicted of same in 2023 in cited case number above. Numerous emails indicate she was in contact with Defendants Conflict International, Inc., "Mike" of Conflict, McLaren,  and other third parties sharing false and defamatory information about Komorek, with the intent to harm him personally, professionally and economically, including but not limited to tortious interference with the contractual relationship between Jacobson and Komorek.

### THIRD PREDICATE ACT

**Criminal Violation of Wire Fraud, 18 U.S.C. § 1343  as and against Defendant Andrew McLaren.**

120.     Upon information and belief, on or about April 1, 2022 3:52am, Andrew McLaren sends email to Victoria Pressly, Subject: Should you send this to Trudy from me? Content contains letter from McLaren.

121.     At 0:45am, Pressly forwards McLaren's Letter to Jacobson. Letter claims Komorek failed to pay McLaren his 10% commission on monies paid to Komorek/Conflict International from Jacobson, and that he, McLaren, terminated his business relationship and friendship with Komorek since he did not keep his word.

25

122.     On information and belief, McLaren later recants the claim and apologizes to Jacobson via text or email.

123.     Upon information and belief, McLaren, in 2022, via LinkedIn social media platform contacts Kyle Reyes, then National Spokesperson for Law Enforcement Today, and repeats accusations of debt owed by Komorek and shares screen shot portions of the Matthew Parker letter that falsely denigrates Komorek's military career and record, previously mentioned above and incorporated herein as if rewritten in its entirety.

124.     Upon information and belief, on or about August 3, 2022, McLaren, via LinkedIn social media platform, contacts General Counsel of API, Patrick J. Welsh, and tells him he is being deceived by Komorek and then shares screen shots of Komorek's military record and portions of Matthew Parker's letter, including the parts that state: "Discharged from the National Guard as medically unfit for service, but that also covers behavioral discharges. It is reported he was found to be a habitual liar. No personally earned awards….."

125.     As a result of the above information and belief, McLaren was sent  the following Cease and Desist Notice from Mr. Welsh:

Via FEDERAL EXPRESS, CERTIFIED MAIL
& FIRST CLASS MAIL

Andrew McLaren
3535 Mountain Creek Road
Apt C8
Chattanooga, TN 37415

Re:     Cease and Desist Notice and Demand Regarding
Stephen J. Komorek, CEO; Patrick J. Welsh, COO/General Counsel
and API International Consulting Group, Inc

Mr. McLaren:
As General Counsel and Chief Operating Officer of API International Consulting Group, Inc., I am writing you to place you on notice to immediately cease and desist in certain actionable activities engaged in and by you against Mr. Komorek, myself and our company.

Specifically, you have transmitted electronic communication to myself and other third parties disparaging the reputation of Mr. Komorek, with the intent to harass and harm Mr. Komorek, personally and professionally. Additionally, your intentional and or reckless conduct is extreme and outrageous, resulting in personal and professional harm to him, myself and our company. Your conduct can reasonably be interpreted as violation of local, state and possibly federal laws, as well as violation of Private Investigator laws. Inasmuch as you hold yourself out as the US Business Development Manager of Conflict International, Inc on LinkedIn and appear as same on Conflict's website, a copy of this Cease and Desist Notice will be sent to them, as liability may be reasonably be imputed to them based on past tortious activities.

You are specifically being notified to have no further correspondence with Mr. Komorek, myself or anyone associated with our company, including clients. Further, you are on notice to discontinue the dissemination of tortious statements or the unlawful disclosure of personal or professional documents related to Mr. Komorek, myself or our company. Failure to comply with these notices and demands will result in a wide array of legal remedies against you to protect Mr. Komorek, myself and our company and those associated with it.

_____

Patrick J. Welsh, Esq.
General Counsel/COO
API International Consulting Group, Inc.

Plaintiff alleges the following**:**

**Culpable Person**

126.     Defendant Conflict International, Inc is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

127.     Defendant Conflict International, Inc., is a "Culpable Person" under RICO.

128.     Defendant Michael LaCorte is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

129.     Defendant Michael LaCorte is a "Culpable Person' under RICO.

130.     Defendant Michael Tapling is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

131.     Defendant Michael Tapling is a "Culpable Person" under RICO.

132.     Defendant Joseph Hill is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

133.     Defendant Joseph Hill is a "Culpable Person" under RICO.

134.     Defendant Andrew McLaren is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

135.     Defendant Andrew McLaren is a "Culpable Person" under RICO.

136.     Defendant Victoria Pressly is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

137.     Defendant Victoria Pressly is a "Culpable Person" under RICO.

138.     Defendant JW Bearden & Associates PLLC is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

139.     Defendant JW Bearden& Associates PLLC is a "Culpable Person" under RICO.

140.     Defendant Bearden Investigative Agency is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

141.     Defendant Bearden Investigative Agency is a "Culpable Person" under RICO.

142.     Defendant James Wesley Bearden is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

143.     Defendant James Wesley Bearden is a "Culpable Person" under RICO.

144.     Defendant Michael Thompson is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

145.     Defendant Michael Thompson is a "Culpable Person" under RICO.

146.     Defendant World Association of Detectives, Inc., is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

147.     Defendant World Association of Detectives, Inc., is a "Culpable Person" under RICO.

148.     Defendant Robert Heales is an individual capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3).

149.     Defendant Robert Heales is a "Culpable Person" under RICO.

150.     Does 1- 10, upon information and belief, are individuals capable of holding a legal or beneficial interest in property as defined by 18 U.S.C. §1961 (3) and are a "Culpable Person" under RICO.

**Enterprise**

151.     Defendant Conflict International, Inc., on information and belief, is a duly incorporated entity in the State of New York, United States of America, with a satellite office in the State of North Carolina.

152.     Defendant Conflict International, Inc., on information and belief, engages outside individuals, entities or companies to act on its behalf in business development, contract services, and client relations, including but not limited to the Defendants named herein.

153.     Defendant Conflict International, Inc., on information and belief, has an existence apart form and beyond the racketeering activity complained of in this action, and is an entity from the person Michael LaCorte.

154.     Conflict International, Inc., comprises an enterprise as defined in 18 U.S.C. §1961(4).

155.     Defendant Michael LaCorte is, on information and belief, the direct or indirect owner and principal control person of Defendant Conflict International, Inc., a duly incorporated entity in the State of New York, United States of America

29

**Interstate Commerce**

156.     The activities of the enterprise and the predicate acts of racketeering complained of herein affect interstate commerce.

157.     Conflict International, Inc., LaCorte and the other Defendants affected interstate commerce through use of the mail, interstate wires, and other instrumentalities of interstate commerce in executing their plan or scheme to harm the Plaintiff, through personal and profession assaults on his reputation, trade reputation and economic opportunity, both domestically and internationally.

158.     In executing this plan or scheme it was reasonably foreseeable that the mail and or wires would be used, and in fact, the Defendants used various social media platforms, the USPS text and email services, or other instrumentalities of interstate commerce to further their plan/scheme and said services makes use of interstate wire communications.

159.     Various Defendants utilized LinkedIn, instant messaging apps on cell phone devices and email services, all carried over interstate wire transmissions, regardless of the recipient or viewer was within or without New York.

**Pattern of Racketeering**

160.     Conflict International and other Defendants have violated the provisions of 18 U.S.C. §1962(c) by conducting or participating, directly or indirectly, in the conduct or the affairs of an enterprise pr enterprises, through a pattern of racketeering activity, as further set forth with the required specificity under each separate count.

161.     The pattern of racketeering activity described herein and conducted an operated by Conflict International, Inc. and the other Defendants commenced on or about February 24, 2022 and continues through the present day.

162.     The pattern of racketeering conducted by Conflict International, Inc., and effected by the Defendants consisted of multiple predicate acts which are related and continuous and have the same or similar purposes, results, participants, victims, methods of commission, or otherwise interrelated by distinguishing characteristics and are not isolated events, the last of which occurred within ten years after the commission of a prior act of racketeering activity as described above, and as such constitutes a "pattern of racketeering" as defined in 18 USC § 1961(5).

**Racketeering Activity**

163.     Defendant Conflict International and the other Defendants' Predicate Acts as below set forth constitutes "racketeering activity" as defined in §1961(1) of RICO, in that they involve criminal violations under Privacy Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); False Statements 18 U.S.C. 1001; Mail Fraud 18 U.S.C. 1341; Wire Fraud 18 U.S.C. § 1343; Perjury 18 U.S.C. 1621; Unsworn Declarations Under Penalty of Perjury 28 U.S.C. 1746; Criminal Harassment by Telecommunication Device in violation of State of Kansas, Uniform Public Offense Code 9, 18 U.S.C. 2261A, Stalking; and/or in violation of New York Statute 240.26; Common Law Unfair Competition: for Fraud: for Trade Libel; for Libel Per Se; for Injurious Falsehood; for Tortious Interference With Existing Business Relations; for Tortious Interference With Prospective Business Relations/Economic Advantage; for Intentional Infliction of Emotional Distress; for Unreasonable Intrusion Upon Seclusion; for Prima Facie Intentional Tort, all with the intent to damage the business and property of the Plaintiff, including his personal and professional reputation and/or economic opportunity.

**Injury**

164.     Plaintiff Komorek is a "person" who sustained injury to his business, property and or personal and professional reputation by reason of the Defendants' violation of 18 U.S.C. §1962 et Seq.

165.     Plaintiff's injury under Section 1962(c) stems from the predicate acts conducted by the Defendants as herein stated.

**Statute of Limitations**

166.     The complained of unlawful activities are ongoing. The doctrine of continuing tort or injury applies to the claims asserted herein.  Therefore, there is no time to bar this action other than the 10 year rule outer limit for civil-RICO.

**Standing to Sue**

167.     Plaintiff's standing to bring civil RICO claims will be established showing a pattern of violation of 18 U.S.C. §1962 by the Defendants, with such violations directly causing injury to Plaintiff's business or property, which Plaintiff alleges here and sets forth with the required specificity herein under each separate count.


## COUNT I


**RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT §1962(c)**

168.     The allegations set forth in paragraphs 1 through 167 of this Complaint are re-alleged as if fully re-written herein.

169.     Conflict International Inc., is an enterprise engaged in and whose activities affect interstate commerce.

170.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

171.     Conflict International Inc., and the other Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally injuring the Plaintiff and his business.

172.     Pursuant to and in furtherance of their unlawful and scheme the Defendants engaged in the following Criminal Violations of the Privacy Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); False Statements 18 U.S.C. 1001; for Mail Fraud 18 U.S.C. 1341; for Perjury 18 U.S.C. 1621; for Unsworn Declarations Under Penalty of Perjury 28 U.S.C. 1746.

173.     On or before April 12, 2022, Defendant and Principal of the RICO enterprise, Conflict International, by and through LaCorte, retained attorney Defendant James W. Bearden (aka Wes Bearden) and his law firm  Defendant JW Bearden & Associates PLLC, "Due to several discovered issues, Conflict requested my firm prepare and draft, on their behalf, an ethics complaint against Mr. Komorek with the World Association of Detectives, Inc. ("the WAD"). (see letter from Wes Bearden to Office of the Chief of Disciplinary Counsel, De. 6, 2022 RE: Complaint 202207022).

174.     On or before April 12, 2022, Defendant JW Bearden & Associates PLLC retained Defendant Bearden Investigative Agency and Defendant Michael Thompson to "determine the extent to which Mr. Komorek made misrepresentations to my Client regarding his previous employment and military service." (see letter from Wes Bearden to Office of the Chief of Disciplinary Counsel, De. 6, 2022 RE: Complaint 202207022)

175.     On or about April 12, 2022, Defendant Michael Thompson executed Form SF180.

The Form SF 180 completed and signed by Thompson clearly shows checked boxes under Section II , 1 including: DD Form 214; Official Military Personnel File (OMPF); Medical Records and Other (typed in "Final duty status, final rank, salary, transcript of any court martial trials).

176.     Also checked under Section II, 2, Purpose is the following: Employment and Other (typed in "To validate claims made to employer during employment.")

177.     In Section III, 2 Relationship to Veteran, is typed No Relation to the Veteran, and box Other is checked with typed in, "Investigator".

178.     In Section III, 5 Authorization Signature, Thompson provided an illegible signature.

179.     Above the signature line the form clearly states the following declaration: "**I declare(or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the information in this section III is true and correct and that I authorize the release of the requested information.** (See items 2a or 3a on accompanying instruction sheet. Without the authorization Signature of the veteran, next -of-kin of deceased veteran, veteran's legal guardian, authorized government agent, or other authorized representative, only limited information can be released unless the request is archival. No signature is required if the request is for archival records.**"**

180.     Komorek is the veteran and did not sign the form, is not deceased and he does not have a legal guardian. Thompson is not an authorized government agent, or  other authorized representative for Komorek.

181.     This form was mailed, via USPS to Department of Veterans Affairs, ATTN: Release of Information, Claims Intake Center, PO Box 4444, Janesville, WI 53547-4444.  This is

actually the address of the VA Compensation Intake Center – an office which does not handle personnel or medical records matters.

182.    On page 2 of the Instruction Sheet for SF180, it clearly lists the addresses for Army Personnel Records and Medical or Service Treatment Records. Nowhere on the lists of addresses for all branches of the military, pg2 of the Instruction Sheet, does the WI address appear.

183.    The VA Compensation Intake Center forwarded the SF180 to the proper office that handles Medical/Treatment request – because Thompson checked the box for release of Medical Records in Section 2 of Form SF 180.

184.    April, 26, 2022 The office in St. Louis received and processed the request and sent Komorek a cover letter and requested items, minus the Personnel File, believing he had signed the Authorization line, therefore he was the requester.

185.    The VA letter, dated September 26, 2022, to Komorek, states, "This is in response to your Privacy Act request dated April 26, 2022. We have provided you with the following record(s): Military Separation Document(s), Official Military Personnel File, and Service Treatment Records."

186.    Inasmuch as the Form 180, Privacy Act request completed and signed by Defendant Thompson indicates the same records sent to Komorek were to be sent to him, at his office in Texas, Plaintiff has reason to believe the records were indeed sent to Thompson and were obtained by Thompson in violation of the Privacy Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); False Statements 18 U.S.C. 1001; for Mail Fraud 18 U.S.C. 1341; for Perjury 18 U.S.C. 1621; for Unsworn Declarations Under Penalty of Perjury 28 U.S.C. 1746.

187.     If the documents were not sent to Thompson, then his actions were an attempt to obtain same in violation of the Privacy Act of 1974 and Freedom of Information Act (5 U.S.C. § 552 et. Seq); False Statements 18 U.S.C. 1001; for Mail Fraud 18 U.S.C. 1341; for Perjury 18 U.S.C. 1621; for Unsworn Declarations Under Penalty of Perjury 28 U.S.C. 1746.

188.     As a result of Defendants conduct herein, Plaintiff has suffered emotional distress that has required medical intervention.

189.     As a direct and proximate result of the Predicate Acts committed by the Defendants, racketeering activities and violations of 18 USC §1962(c), Plaintiff Komorek has been injured in his business and property in that he has been denied valuable business opportunities, has suffered damage to his business and property, and has suffered irreparable damage to his business reputation and goodwill.

190.     As a result of Defendants violations of Section 1962(c), Plaintiff has been damaged in an amount to be determined at trial, believed to be not less than $5 million USD.

191.     18 USC §1964 (c) creates a private right of action for treble damages for the criminal wrongs complained of herein.

## COUNT II

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT §1962(c)

192.     The allegations set forth in paragraphs 1 through 191 of this Complaint are re-alleged as if fully re-written herein.

193.     Conflict International Inc., is an enterprise engaged in and whose activities affect interstate commerce.

194.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

195.     Conflict International Inc., and the other Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally injuring the Plaintiff and his business, API.

196.     Pursuant to and in furtherance of their unlawful and scheme the Defendants engaged in the following Criminal Violations Criminal Harassment by Telecommunication Device in violation of State of Kansas, Uniform Public Offense Code 9.10 (see attached Conviction Journal Entry, Municipal Court of Leawood, KS, Case #22-MD-160571); and/or in violation of 18 U.S.C. 2261A, Stalking; and/or in violation of New York Statute 240.26, Harassment; and Tortious Interference With Existing Business Relation.

197.     On or about February 24, 2022 Defendant Victoria Pressly began an unrelenting pattern of criminal harassment towards a then client, identified here and known to the Defendants as TJ, of Conflict International, Inc.

198.     Her first contact stated: Feb. 24, 2022: Text from Pressly to Jacobson, alleges Komorek had cheated Andrew McLaren out of 10% commission on all the work Komorek and Conflict International were doing on her behalf. McLaren is the party who introduced/referred Jacobson to Komorek and Conflict in 2021 for a matter involving possible extortion by an individual in NYC, where Jacobson maintains a second home. Jacobson asked Pressly who gave her this info, and she advised Andrew McLaren.

199.     On or about March 4, 2022, TJ terminated her relationship with Conflict International Inc., and Pressly, pressed forward with her criminal harassment.

200.     March 25th text from Pressly to Jacobson

0737 am " What are you doing? Why is Mike from Conflict asking me for calls and telling me Stephen left an open invoice in your name close to $100,000 in work? Are you partners and backing Stephen's new business? He left so many unpaid bills in your name and said you were not paying yet? Work he ordered and never paid people? Are you aware of any of this mess? Why is this happening? They said he posted he a Philanthropist like you have posted on your page? What did Stephen do? My God."

201.     The mention of this "outstanding invoice" by Pressly, upon information and belief was communicated to Pressly by Andrew McLaren, was for over $112,000. The disclosure of this information was made three days before an actual invoice was prepared by Michael Tapling, Conflict International Director of US Operations and later provided to James Wes Bearden, JW Bearden & Associates PLLC, 1341 West Mockingbird Lane, Ste 820W, Dallas, TX 785247.

202.     The actual invoice was dated March 28 and transmitted to Mrs. Jacobson's lawyer's office via email on 4/6/2022, by attorney, J. Wes Bearden, JW Bearden & Associates PLLC, 1341 West Mockingbird Lane, Ste 820W, Dallas, TX 785247.

203.     This invoice has been determined to be fraudulent, as the actual work performed by Conflict International totaled less than $40,000.00, and said accurate invoice had been transmitted to Jacobson prior to the resignation of Komorek from Conflict International, Inc.

204.     Upon counsel's advice, this  grossly padded invoice has not been paid by Jacobson, even though Bearden has made attempts to collect same since being advised by counsel the invoice is not correct.**)**

205.     March 29th multiple emails (4:27am, 5:09am, 5:12am,5:21am, 1:12pm7:00pm) Pressly repeatedly makes reference to allegations of misconduct by Komorek while at Conflict and tells Jacobson to contact "Mike".

206.     On or about March 30, 2022, Defendants Conflict International, Inc., Andrew McLaren and Victoria Pressly were notified by the law firm representing TJ to Cease and Desist in their harassing behavior and contact with the client. But Pressly pressed on with her criminal harassment.

207.     April 1, 2022 3:52am, Andrew McLaren sends email to Pressly, Subject: Should you send this to Trudy from me? Content contains letter from McLaren.

208.     At 0:45am, Pressly forwards McLaren's Letter to Jacobson. Letter claims Komorek failed to pay McLaren his 10% commission on monies paid to Komorek/Conflict International from Jacobson, and that he, McLaren, terminated his business relationship and friendship with Komorek since he did not keep his word.

209.     April 1, 20222 1:20pm, email to Jacobson from Pressly.  Subject: It was you I trusted and loved. Accuses Jacobson of putting Pressly in the middle of Jacobson's drama. "Stephen, Conflict International and Andrew have massive issues over money over your account which also was not my drama."

210.     May 11th, from 9:47am to 10:48am there are 2 emails.

211.     The first is referring to a recently published article in Law Enforcement Today, an online newspaper for law enforcement and Pressly defends herself from the contents of the article.  She claims Jacobson and Komorek authored the post.

212.     May 12th, between 8:21pm to 9:25pm there are 4 emails.

213.     The first email at 8:21pm, Subject line is request to "just talk and have a conversation please". The body of the email contains 5 numbered paragraphs. They range from Pressly expressing how "I love working with you! Talking with each other, miss you.", to being critical of Stephen, Andrew and Sergio, calling them (Stephen and Andrew), "drama queens', Sergio "damaged" and Stephen "out of control" Paragraph 5 closes with Pressly stating, "please let's just stop all this I really liked you and miss you."

214.     May 19th, There are 2 emails, 10:08am and 10:12am, accusing Jacobson of posting negative reports on a website called Rip Off Reports. Tells Jacobson to get a life, nobody cares and that Jacobson and Stephen need to stop. Also accuses Jacobson of "paying Stephen $30,00 give or take a month for Rip Off Reports."

215.     June 7th, there are 2 emails , 3:41pm and 3:43pm. The first, Subject line, "I'd like to resolve any issues." The body goes on to state Pressly wants to work things out, thought they had a great relationship.

216.     She repeats claim that Komorek owes Andrew $40,000, and instead smeared her.

217.     June 26th, there are three emails 10:22 pm, 10:25pm and 10:33 pm, all related to same topic, but with a mixture of recipients.

218.     10:22pm, Subject line, "Stop Involving Me" and changes the Subject line to "Stop involving me in your defamation".

219.     These emails were Sent to : kfm@mccallionlaw.com; itstherbf@aim.com; mrdaveyLA@yahoo.co.uk; Jacobson and andrewmclaren008@gmail.com

220.     In the body of message: Pressly writes, "got call from Melissa prophet and Gretchen Bonaduce that Trudy, Stephen and Davey have put together a fake fraud case about me. I'm not involved in Trevor's and Trudy's case about their sex trafficking and hired escort for

sex contract." "Trudy's detective called my clients and said I pissed off a rich lady and she is out for revenge. Her detective John said he had a list of people to call and question who all basically said it is a ridiculous case. Trudy has a fatal attraction against Trevor and Stephen her detective is making up false investigation to get money out of her. Leave me out of your equation. I don't want to be involved."

221.    The above are summaries of emails mentioning Plaintiff and falsely accusing him of various wrongful acts.

222.    There are many more emails and all combined served as the foundation for and evidence in criminal charges being filed against Pressly in Leawood, KS, with Jacobson as the victim of the harassment.

223.    Pressly was convicted of same in 2023 in cited case number above.

224.    Numerous emails indicate she was in contact with Defendants Conflict International, Inc., "Mike" of Conflict, McLaren, Shapiro, and McCallion sharing false and defamatory information about Komorek, with the intent to harm him personally, professionally and economically, including but not limited to tortious interference with the contractual relationship between Jacobson and Komorek.

225.    As a direct and proximate result of the Predicate Acts committed by the Defendants, racketeering activities and violations of 18 USC §1962(c), Plaintiff has been injured in his business and property in that he has been denied valuable business opportunities, has suffered damage to his business and property, and has suffered irreparable damage to his business reputation and goodwill.

226.    As a result of Defendants violations of Section 1962(c), Plaintiff has been damaged in an amount to be determined at trial, believed to be not less  than  $1 million USD.

18 USC §1964 (c) creates a private right of action for treble damages for the criminal wrongs complained of herein.

## COUNT III

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT §1962(c)

227.     The allegations set forth in paragraphs 1 through 226 of this Complaint are re-alleged as if fully re-written herein.

228.     Conflict International Inc., is an enterprise engaged in and whose activities affect interstate commerce.

229.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

230.     Conflict International Inc., and the other Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally injuring the Plaintiff and his business.

231.     Pursuant to and in furtherance of their unlawful and scheme the Defendants engaged in the following Criminal Violation of Wire Fraud, 18 U.S.C. § 1343:

232.     Upon information and belief, on or about April 1, 2022 3:52am, Andrew McLaren sends email to Victoria Pressly, Subject: Should you send this to Trudy from me? Content contains letter from McLaren.

233.     At 0:45am, Pressly forwards McLaren's Letter to Jacobson. Letter claims Komorek failed to pay McLaren his 10% commission on monies paid to Komorek/Conflict International from Jacobson, and that he, McLaren, terminated his business relationship and friendship with Komorek since he did not keep his word.

234.     On information and belief, McLaren later recants the claim and apologizes to Jacobson via text or email.

235.     Upon information and belief, McLaren, in 2022, via LinkedIn social media platform contacts Kyle Reyes, then National Spokesperson for Law Enforcement Today, and repeats accusations of debt owed by Komorek and shares screen shot portions of the Matthew Parker letter that falsely denigrates Komorek's military career and record, previously mentioned above and incorporated herein as if rewritten in its entirety.

236.     Upon information and belief, on or about August 3, 2022, McLaren, via LinkedIn social media platform, contacts General Counsel of API, Patrick J. Welsh, and tells him he is being deceived by Komorek and then shares screen shots of Komorek's military record and portions of Matthew Parker's letter, including the parts that state: "Discharged from the National Guard as medically unfit for service, but that also covers behavioral discharges. It is reported he was found to be a habitual liar. No personally earned awards….."

237.     As a result of the above information and belief, McLaren was sent  the following Cease and Desist Notice from Mr. Welsh:


        Via FEDERAL EXPRESS, CERTIFIED MAIL
        & FIRST CLASS MAIL

        Andrew McLaren
        3535 Mountain Creek Road
        Apt C8
        Chattanooga, TN 37415

                Re:     Cease and Desist Notice and Demand Regarding
                        Stephen J. Komorek, CEO; Patrick J. Welsh, COO/General Counsel
        and API International Consulting Group, Inc

        Mr. McLaren:

As General Counsel and Chief Operating Officer of API International Consulting Group, Inc., I am writing you to place you on notice to immediately cease and desist in certain actionable activities engaged in and by you against Mr. Komorek, myself and our company.

Specifically, you have transmitted electronic communication to myself and other third parties disparaging the reputation of Mr. Komorek, with the intent to harass and harm Mr. Komorek, personally and professionally. Additionally, your intentional and or reckless conduct is extreme and outrageous, resulting in personal and professional harm to him, myself and our company.

Your conduct can reasonably be interpreted as violation of local, state and possibly federal laws, as well as violation of Private Investigator laws. Inasmuch as you hold yourself out as the US Business Development Manager of Conflict International, Inc on LinkedIn and appear as same on Conflict's website, a copy of this Cease and Desist Notice will be sent to them, as liability may be reasonably be imputed to them based on past tortious activities.

You are specifically being notified to have no further correspondence with Mr. Komorek, myself or anyone associated with our company, including clients. Further, you are on notice to discontinue the dissemination of tortious statements or the unlawful disclosure of personal or professional documents related to Mr. Komorek, myself or our company.

Failure to comply with these notices and demands will result in a wide array of legal remedies against you to protect Mr. Komorek, myself and our company and those associated with it.


Patrick J. Welsh, Esq.
General Counsel/COO
API International Consulting Group, Inc.


238.    As a direct and proximate result of the Predicate Acts committed by the

Defendants, racketeering activities and violations of 18 USC §1962(c), Plaintiffs have been

injured in his business and property in that he has been denied valuable business opportunities,

has suffered damage to his business and property, and has suffered irreparable damage to his

business reputation and goodwill.

239.     As a result of Defendants violations of Section 1962(c), Plaintiff has been damaged in an amount to be determined at trial, believe d to be not less  than that $1 million.

240.     18 USC §1964 (c) creates a private right of action for treble damages for the criminal wrongs complained of herein.


## COUNT IV

**RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT CONSPIRACY SECTION 1962(d)**

241.     The allegations set forth in paragraphs 1 through 240 of this Complaint are re-alleged as if fully re-written herein.

242.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

243.     Conflict International Inc., and the other Defendants agreed to and conspired to violate U.S.C 18 §1962 (c) by conducting and participating in the conduct and affairs of the enterprise through a pattern of racketeering activity as above set forth.

244.     Defendant Conflict International Inc. and the other Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the conduct constituting a conspiracy to violate 18 U.S.C. §1962(c) in violation of 18U.S.C 1962(d).

245.     As a direct and proximate result of the conspiracy, the overt acts taken in furtherance of the conspiracy, and violations of 18 U.S.C §1962 (d), Plaintiff has been injured in his business, and property in that he has been denied valuable business opportunities, has suffered damage to his business and property, has suffered irreparable damage to his business

reputation and good will, and has suffered extreme emotional distress requiring medical attention.

246. As a direct result of Defendants civil conspiracy, Plaintiff has been damaged in an amount to be determined at trial, believed to be not less than $3 million.


## COUNT V

## FRAUD

## FRAUDULENT INDUCEMENT AS AGAINST DEFENDANTS CONFLICT INTERNATIONAL, INC., AND MICHAEL LACORTE TO ACCEPT EMPLOYMENT AND CAUSING KOMOREK TO UNWITTINGLY PARTICIPATE IN THE PREPARTION AND SUBMISSION OF A FRAUDULENT UNITED STATES VISA APPLICATION FOR LACORTE

247. The allegations set forth in paragraphs 1 through 246 of this Complaint are re-alleged as if fully re-written herein.

248. This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

249. Conflict International, Inc and LaCorte fraudulently represented that Conflict International, Inc., was a company solely owned and incorporated in the State of New York by LaCorte and that Komorek would be given a 20% ownership interest in the company. LaCorte also enlisted the assistance of Komorek in the preparation and submission of an application for LaCorte to receive a United Sates Visa.

250. It was later learned by Komorek, that in IRS form 1120 tax returns, that he had not created, reported that Conflict International, Inc., was a wholly owned (100%) company of

Conflict International, LTD (a UK based company). The IRS forms also indicated Komorek was a Director of the company and compensated as such.

251.    In fact, Komorek was never a Director of the company, he was never issued any shares in the company, and the employment inducement to be made an owner was rescinded by LaCorte, in writing, when Komorek opted to go to a non-salaried, at will position with bonuses. Komorek merely had an administrative title. This is true for all other employees at Conflict since Komorek's resignation. For example, Defendant Michael Tapling, prior to Komorek's resignation was titled Case Manager.  Since the resignation, he is now is Vice President of US Operations, but is neither an officer nor director of the company.

252.    Prior to his resignation, LaCorte enlisted the assistance of Komorek and an attorney to complete an application for a United States Visa. One of the questions on the form asks the applicant if they have ever been arrested for a crime. LaCorte answered "No." The sworn form was submitted and LaCorte was later issued the US Visa.

253.    Since his resignation, Komorek has learned LaCorte, and 6 others with the company he was working for in the UK, in 2000, were arrested and detained in a Cuban prison for over 6 weeks on the charges of Espionage. All were eventually released and deported back to the UK, once the UK government intervened on their behalf.

254.    Upon learning of the arrest, Komorek suffered the emotional distress of going to the appropriate government agencies and reporting the above information, for fear his reputation and working relationship with certain government entities/agencies would be tarnished and/or severed by the agencies. Notwithstanding this distress, Komorek properly reported the new found information.

255.     The misrepresentations, nondisclosure, and/or concealment of material facts made by Defendant LaCorte and Conflict International, Inc., were false and material and were intended by Defendants to mislead Plaintiff, and did in fact mislead the Plaintiff into accepting employment and unknowingly assist in submitting a false US Visa Application

256.     The conduct of the Defendant LaCorte and Conflict International above set forth constitutes fraud.

257.     As a result of the fraud committed by the Defendants Plaintiff has been damaged in an amount to be determined at trial not less than $1 million USD.

258.     In addition to such damages, Plaintiff seeks punitive or exemplary damages as a result of the egregious nature of the fraud committed Defendants Conflict International, Inc., and Michael LaCorte.

## COUNT VI

### Common Law Unfair Competition:

### Fraudulent Accusations to Cause Expulsion from International Trade Organization

259.     The allegations set forth in paragraphs 1 through 258 of this Complaint are re-alleged as if fully re-written herein.

260.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

261.     Komorek resigned from Conflict International, Inc., (CI) at the close of business February 25, 2022. He was an at will employee of CI and did not have an employment contract or non-compete contract.

262.     After resigning he completed an ongoing case for CI, at the request of CI via an email. There was no written contract for same. He completed the case and was later paid $900.00.

263.     In early March, 2022, a current client of CI that Komorek had previously brought in as the client, contacted Komorek and requested API and Komorek provide her ongoing investigative and consulting services.

264.     The client submitted to Komorek, in writing, that Komorek nor API had solicited her business away from CI.

265.     In April, 2022 a second client of CI contacted Komorek, advising he had sent a Cease and Desist Notice to CI on a matter CI had been retained to complete, but had failed to do so since Komorek had resigned.

266.     This client also advised Komorek he had demanded the $10,000.00 retainer be returned, due to failure to complete the assigned work.

267.     This client had also been brought to CI by Komorek. The client requested Komorek and API be hired to complete the work CI had failed to do.

268.     Komorek and API agreed to take the case, at cost only, no service fee or retainer was charged the client.

269.     API completed the work and later learned the client had filed a complaint against CI, with the State of North Carolina licensing board for Private Investigations. In the hearing before the Board, CI claimed they had completed the work and it was Komorek's fault a report had not been sent to the client, CI was admonished by the Board for failing to give the client a report

270.     CI still did not return the retainer and the client sued CI, in the State of North

Carolina, County of Forsyth, In the General Court of Justice, Superior Court Division, Case #23-

CVD-34. It is believed the case was settled in favor of the Plaintiff in 2023.

271.     On June 23, 2022, Conflict International, Mike LaCorte, Roger Bescoby, Jon

Fawcett and Angelo Pascalides filed an "Ethics Complaint Regarding Stephen Komorek", asking

"the Grievance Committee, Lower Court and Board to initiate an ethics inquiry. We respectfully

request the Mr. Komorek be expelled membership from the Board of Directors and the

organization as an Active Member."

272.     This emailed complaint was sent to Bob Heales, in his capacity as Executive

Director.

273.     WAD is a State of Nevada incorporated Non-Profit organization and subject to

NV Revised Statutes (NRS) and specifically the following:

**Universal Citation:** NV Rev Stat § 41.480 (2021)
1. Except as otherwise provided in NRS 41.519 *(equine activity/events italics added for reference purposes only)*, a nonprofit corporation, association or organization formed under the laws of this State is not immune from liability for the injury or damage caused any person, firm or corporation as a result of the negligent or wrongful act of the nonprofit corporation, association or organization, or its agents, employees or servants acting within the scope of their agency or employment.
2. No action may be brought against an officer, trustee, director or other possessor of the corporate powers of a nonprofit association or trust formed under the laws of this State based on any act or omission arising from failure in his or her official capacity to exercise due care regarding the management or operation of the entity unless the act or omission involves intentional misconduct, fraud or a knowing violation of the law.
(Added to NRS by 1957, 63; A 1987, 85; 1991, 1309; 2015, 1324)

**NRS  82.251   Expulsion of member; suspension or termination of membership.**
    1.   A member may not be expelled or suspended, and a membership may not be terminated or suspended, except pursuant to a procedure that is fair and reasonable and is carried out in good faith. This section does not apply to the termination of a membership at the end of a fixed term.

2.     A procedure is fair and reasonable when it is fair and reasonable taking into consideration all of the relevant facts and circumstances. In addition, a procedure is fair and reasonable if it provides:

(a)  Not less than 15 days' prior written notice of the expulsion, suspension or termination, and the reasons for it; and

(b)  An opportunity for the member to be heard, orally or in writing, not less than 5 days before the effective date of the expulsion, suspension or termination by a person authorized to decide that the proposed expulsion, termination or suspension not take place.

3.     A proceeding challenging an expulsion, suspension or termination, including a proceeding in which defective notice is alleged, must be begun within 1 year after the effective date of the expulsion, suspension or termination.

4.     The expulsion or suspension of a member, or termination of a membership, does not relieve the member from obligations the member may have to the corporation for dues, assessments or fees or charges for goods or services.


 (Added to NRS by 1991, 1272)

(but a director or officer is not entitled to rely on such information, opinions, reports, books of account or statements if the director or officer has knowledge concerning the matter in question that would cause reliance thereon to be unwarranted.

3.     A director or officer must not be found to have failed to exercise his or her powers in good faith and with a view to the interests of the corporation unless it is proved by clear and convincing evidence that the director or officer has not acted in good faith and in a manner reasonably believed by him or her to be with a view to the interests of the corporation.

4.     Except as otherwise provided in the articles of incorporation or NRS 82.136 and 82.536 and chapter 35 of NRS, no action may be brought against an officer or director of a corporation based on any act or omission arising from failure in his or her official capacity to exercise due care regarding the management or operation of the corporation unless the act or omission involves intentional misconduct, fraud or knowing violation of the law.

5.     The articles of incorporation may impose greater liability on a director or officer of a corporation than that imposed by subsection 4.

(Added to NRS by 1991, 1269; A 1993, 997)


274.       Additionally, the WAD Bylaws contain the following:

ARTICLE VII – DUTIES
The Executive Director shall perform the following duties:

a)  The Executive Director shall keep an accurate account of the minutes at all meetings of the Association and the Board of Directors; receive and answer all communications addressed to him/her or submitted to him/her for this purpose by the other officers or directors of the Association; and supply and issue applications for membership and receive such applications when executed in accordance with Article IV.

ARTICLE XIII – DISCIPLINE

 Section 11. Any member may file a grievance on the grounds of a bad investigation, exceptionally poor time service or violation of the Code of Ethics which caused the forwarding member embarrassment or loss of prestige with his or her client. A grievance may also be filed for failure to perform. No grievance will be considered unless written agreement/contract between the parties exists, a copy of which must be attached to the grievance. Email exchanges between the parties which include at a minimum, the charges, authorized budget, and required completion deadline of the investigation, may serve as a written contract. Any authorized employee or representative of a member involved in producing the written contract or the email instructions will be considered a party for the purposes of the grievance. Complaints for failure to perform shall be made within 90 days after receipt of the bill.

ARTICLE XIV – PROCEDURE

Section 1.  The current edition of Robert's Rules of Order shall govern the parliamentary conduct of all conferences, meetings, hearings, and administrative functions, rulings, and decisions, except as otherwise provided herein.  The laws of the State of Nevada shall govern the handling of the business affairs of the Association.

275.     In the Complaint, CI alleged the following:

276.     Mr. Komorek's Misrepresentations and Failure to disclose Litigation Regarding His suitability for Employment.

277.     Mr. Komorek Representations Regarding Ongoing Conflict Work Placed Other Members and Conflict in the Position of Potential Liability and Harm.

278.     Komorek's Conduct is Unbefitting of a Member of the Association.

279.     Komorek's Breach of Fiduciary Duties to Conflict Violates Wad's Code of Ethics.

280.     Malicious Property Damage Caused by Mr. Komorek should be Grounds for Removal.

281.     Komorek may Not Currently meet the Licensing Requirements for WAD Membership and may Misrepresent Licensing Status on Public Advertising.

282.     The Defendants collectively and/or individually engaged in intentional and/or fraudulent misconduct and knowingly violated WAD Bylaws, Robert's Rules of Order and Nevada State Rules for Corporations, without reasonable grounds, for an improper purpose of retaliation and to ruin the personal and professional industry reputation of the Plaintiff.

283.     In Complaint #1, reference is made to N.C. Gen. Stat 55-8-30 with respect to fiduciary duties to Conflict International. First, that statute is directed towards N.C. formed entities, i.e., incorporated within NC. Conflict International Inc is a New York formed entity authorized/registered to do business in NC. Thus, subject to NC 55B-16, Foreign Professional Corporations. Stephen Komorek and Conflict International (US), individually and corporately complied with all provisions of this applicable NC statute.

284.     In the Complaint, CI falsely claimed Komorek was an Officer and Director of CI. Komorek was neither an Officer nor Director of Conflict (US). There is no evidence of these positions in the form of the Corporate Minutes appointing him as both an Officer and Director. Such Minutes are required by state laws as a part of conducting business as a corporation.

285.     These titles were conferred on Komorek, verbally at the time of hire, and Komorek was told verbally he would receive 20% equity in the US company.  Such verbal appointments carry no legal weight as evidence in a court of law that Komorek was an Officer and Director for liability purposes. No evidence was attached to the Complaint as proof of being an Officer and Director.

286.     In fact, there is an email from Mr. La Corte to Komorek indicating he was initially hired with a 20% equity interest in the company, with profit sharing renumeration quarterly/annually. This is commonly referred to as being a shareholder.

287.     Share Certificates were never issued to Komorek, even though he requested same multiple times. This email from LaCorte to Komorek goes on to indicate the earlier status of equity ownership was rescinded because Komorek opted to become an at will employee.

288.     Komorek was merely an employee, regardless of what titles were commended upon him via business cards or company correspondence.

289.     Exhibits A and B were attached to this numbered complaint. The complaint to WAD alleges Komorek was sued in NC and he failed to advise CI of this before his pending offer of full time employment.

290.     In fact, the law suit was filed in Franklin County, Ohio, Common Pleas Court, Civil Division. Factually, the allegation is grossly misstated.

291.     What is also misstated, with the intent to impugn Komorek's reputation and to imply a finding of liability, is, "Copies of the most recently known active complaint are attached here as Complainants Exhibit A." The Complaint goes on to state the matter was sealed in State court and removed to Federal Court in 2019.

292.     A few exculpatory facts are left out of the Complaint and very pertinent to the allegations against Komorek, and done so intentionally to further harm Komorek's reputation, and belie an undertone of malicious prosecution for Komorek's expungement from WAD, and presented before WAD, their lower court and Board, and later repeated at a WAD Appeals Hearing.

293.     Cases are sealed for a reason in the US. One such reason is when courts deem the nature of the allegations, yet to be proven in a trial, are so severe as to damage the reputation of the accused, especially if acquitted in a trial.

294.     In such cases and upon a Motion by the accused, such Complaints are sealed to protect the rights and compelling interest of the accused. This is why the case was sealed by the court.

295.     Another exculpatory fact left out of the complaint before the Board is the Federal Court remanded the case back to State Court, where it was dismissed on Dec. 3, 2019, pursuant to a waiver and release of claims, with prejudice signed by all parties against each other.

296.     Thus the statement of the Complaint to the Board about a "known active complaint" is grossly false and misleading and designed to harm the Plaintiff's reputation and standing with WAD.

297.     This waiver/release is also a sealed document and cannot be released to the Board and Komorek would have been in violation of the Court's Order to not disclose the allegations and outcome in the original law suit in his defense of the false allegations by CI.

298.     Allegation #2, of the WAD Complaint leaves out many pertinent facts that discredits the veracity of the Defendants in this matter. The source for this complaint is noted as Exhibit B.

299.     First, there are two (2) Exhibit B's attached – one is the original Civil Complaint noted in complaint #1 above; the other is a heavily redacted "email sent to Mr. Komorek setting out details including compromised surveillance", purporting to be forwarding an email sent from an unknown female's iPhone on January 19, 2022 to someone named Johnny.

300.     Conflict would have the WAD Board and Lower Court to believe an unknown individual crafted a 14 page email to a redacted unknown male, simply identified as Johnny, alleging an unknown party (redacted) "is hiring private investigators to stalk and harass me, my current girlfriend (who the writer calls "Sally", not her real name) and others involved in this email (all others are conveniently redacted.)

301.     Nowhere is Conflict International or Mr. Komorek named as being a party to the allegations, nor are any of the supposed attachments in the anonymous letter attached to the Ethics Complaint.

302.     A fundamental principle in American jurisprudence is Due Process, fundamental fairness. It is fundamentally unfair to be expected to defend oneself from anonymous, (redacted names)complaints of misconduct – including redacting all parties involved – and for a court to just assume the accused is one of those redacted parties, or that any of the allegations are true.

303.     Secondly, another principle in Due Process is laying a foundation for the evidence purporting to sustain the guilt or innocence of the accused. This email is to an unknown party from a redacted party.

304.     How did Conflict International (UK) obtain this email and from whom? If it was from the sender or the recipient then there are no privacy issues to disclose their identities, so Mr. Komorek could properly respond to the allegations.

305.     Rather, the WAD Board, via Heales and other Board Members, advised Komorek he was not allowed to question CI, either in writing or at a hearing.

306.     Finally, the Complaint by Conflict UK and Defendant LaCorte alleges the subject of surveillance "raised police complaints on three separate occasions."

307.     Again, this is a self-serving allegation by an unknown (redacted) source and not substantiated by copies of sourced complaints, investigation of such complaints or the outcome of said complaints.

308.     The Complaint implies this letter is related to "Mr. Komorek Representations Regarding Ongoing Conflict Work Placed Other Members and Conflict in the Position of Liability and Harm".

309.     Again, more pertinent exculpatory facts are being left out that clearly refute the veracity of the complaint.

310.     "At no point during the structured preparations for this surveillance did Mr. Komorek reveal this knowledge to the team of investigators who would be conducting the surveillance or to Conflict International's Officers and Directors." Quite the contrary is true.

311.     The history of this case actually involved Conflict International (UK) personnel, both in Spain (referenced in redacted letter) and the US.

312.     The senior staff at UK, including Defendant LaCorte, knew of the upcoming surveillance in NY in February and that Mr. Komorek, who was a NY licensed PI, and two subcontractors, also licensed in NY, were to conduct the operation.

313.     Mr. La Corte  and a Jon Fawcett overruled Komorek's plan, as he had presented it to them, and substituted a UK investigator, not licensed anywhere in the US, along with two unlicensed US staff members and 1 licensed member to conduct the operation.

314.     Komorek was ordered to stand down and the UK investigator was in charge of running the operation.

315.     Missing from the complaint that alleges how staff were placed in a position of potential liability and harm, is the fact the four (4) team members joined the weekly staff

meeting from their vehicles while conducting the surveillance and reported that nothing significant had transpired.

316.      Komorek was also on the video staff meeting from his residence in Ohio.

317.      Also missing from the complaint are the following facts: as a result of the initial phases of this investigation an ongoing fraud investigation for the very same client was initiated after Komorek resigned.

318.      The client is represented by a prestigious NY law firm who has retained API's consulting and investigative services, not Conflict International, Inc. services for this former client.

319.      Both law enforcement and a District Attorney in NY were advised of the fraud investigation and the matter was deconflicted through them before the investigation commenced.

320.      Finally missing from this complaint, and most disturbing, is the client, from whom the NY operation was instructed, received, after Mr. Komorek left Conflict, an invoice from Conflict US for nearly $113,000.00.

321.      This invoice was forwarded by Wes Bearden to the client's lawyers, on behalf of Conflict.

322.      The invoice itemized 6 agents for services rendered, for hours not actually worked and for expenses.  One US agent actually was released from the detail for half of day 4 and all of days 5 and 6 – yet the client was billed for his time that was never worked.

323.      The attorney in NY is representing the client on this matter. This is the very invoice referred to in the Second Predicate Act, March 25, 2022 email from Pressly to Jacobson, wherein Komorek is falsely accused of misconduct.

324. WAD Complaint #3 references two "resignation letters" from former employees, wherein they claim they did not like Mr. Komorek's manner of management of the office.

325. Again, the complaint is missing pertinent facts. While the letters are redacted as to who wrote them, one that "resigned" actually quit and then after talking with UK senior leadership rescinded her resignation and returned to work at Conflict. And later quit again.

326. The other letter clearly states she is resigning to take a job that pays her $1,200 more a month than her salary at Conflict. As an aside, she comments on her disappointment in Mr. Komorek's management style.

327. WAD Complaint #4 cites a number of allegations. With respect to fiduciary duty, please refer back to Complaint #1.

328. As to standing up a new company in Ohio 2 days before his resignation on February 25, 2022:

329. Mr. Komorek was an employee of Conflict, not an officer or director. He has every right to stand up a company.

330. He was not under a Non-Compete Agreement, and even if he were, his new company was multiple states away from NY (site of Conflict's incorporation) and the same from NC, site of a Conflict office.

331. The incorporation paperwork and website for API International Consulting Group, Inc., clearly indicates the company was stood up as a consulting group with multiple services – including training and philanthropy. Nothing in his incorporation of a new company was a breach of a fiduciary duty to Conflict, nor a violation of statutory or common law in Ohio, NY or NC.

(see In *American Federal Group, Ltd. v. Rothenberg*, 136 F.3d 897 (2nd Cir. 1998), the United States Court of Appeals, Second Circuit noted that, under New York law, officers and directors are under a duty to deal fairly, in

59

good faith, and with loyalty to the corporation and other shareholders. The scope of this fundamental duty is determined by the circumstances of each case. Merely taking steps that do not involve the dereliction of positive duties to a current employer in preparation for engaging in competition with that employer after leaving its employ may not involve any breach of fiduciary duty (at 905-906):

Addressing the breach of fiduciary duty claim, the magistrate judge first accurately identified the controlling legal principles under New York law. We summarize them here as the controlling principles for our application in review. First, and fundamentally, one who, like Rothenberg, is a shareholder, officer and director of a closely held corporation, is under a duty "to deal fairly, in good faith, and with loyalty" to the corporation and other shareholders. See, e.g., *Benson v. RMJ Sec. Corp.,* 683 F.Supp. 359, 375 (S.D.N.Y.1988). This requires that he exert his best efforts in behalf of the corporation and not compete with it or profit at its expense, or place his private interests in conflict with its. See *Ability Search, Inc. v. Lawson*, 556 F.Supp. 9, 15 (S.D.N.Y.1981), aff'd, 697 F.2d 287 (2d

Page 906

Cir.1982). The scope of this fundamental duty is determined, however, by the circumstances of each case, and does not run to every act having any semblance of employee self-interest. See *Burg v. Horn*, 380 F.2d 897, 900 (2d Cir.1967). Thus, merely taking steps not involving any dereliction of positive duties to a current employer in preparation for engaging in competition with that employer after leaving its employ may not involve any breach of fiduciary duty. See, e.g., *Abraham Zion Corp. v. Lebow,* 593 F.Supp. 551, 571 (S.D.N.Y.1984) (filing for and obtaining trademark registration), aff'd, 761 F.2d 93 (2d Cir.1985); *Schneider Leasing Plus, Inc. v. Stallone*, 172 A.D.2d 739, 741, 569 N.Y.S.2d 126, 128 (1991) (incorporating later competing business). One, however, clearly crosses the line by going further in preparatory steps by actively soliciting the customers of his current employer and diverting his current employer's business to himself. See, e.g., *AGA Aktiebolag v. ABA Optical Corp.*, 441 F.Supp. 747, 754 (E.D.N.Y.1977).

The Court also noted that an employee may not utilize information obtained in a fiduciary capacity to appropriate a business opportunity. This duty does not cease when a fiduciary employee leaves their corporate employment. Former employees may not misappropriate and utilize confidential information (at 906):

Further, the corporate opportunity doctrine prohibits a corporate employee from utilizing information obtained in a fiduciary capacity to appropriate a business opportunity belonging to the corporation. See, e.g., *Alexander & Alexander, Inc. v. Fritzen*, 147 A.D.2d 241, 246, 542 N.Y.S.2d 530, 533 (1989). And, this doctrine applies even

60

after one owing fiduciary duties leaves his corporate employment. See *Abbott Redmont Thinlite Corp. v. Redmont*, 475 F.2d 85, 88 (2d Cir.1973). The doctrine's application is limited, however, to business opportunities in which a corporation has a "tangible expectancy" which means "something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope." *Alexander,* 147 A.D.2d at 247-48, 542 N.Y.S.2d at 534 (quotation omitted).)

332.     Another self-serving allegation for which Mr. Komorek had no way of defending against is that "an associate of API then attempted to recruit Conflict International employees located in the US to work for Komorek's newly created entity."

333.     This is a baseless allegation, unsupported by any shred of proof or evidence.  And even if API did try to recruit employees from Conflict or elsewhere, there is no breach of any duty to Conflict. Employees are not property of the employer that makes them exempt from being solicited to join a new company.

334.     The next baseless statement in the WAD Complaint, designed to impugn the reputation of the Plaintiff and for the purpose of having him expelled from an international industry association,  was the "belief of the undersigned that Komorek has obtained former clients of Conflict International causing unknown financial damage to Conflict International".

335.     There is nothing done by Mr. Komorek or API that is "unscrupulous invasion of our business contracts with clients by any member who intrudes knowingly and willfully for his own private advantage or financial gain to the detriment and/or injury of another member."

336.     Quite the contrary, upon separating from Conflict, Mr. Komorek took scrupulous effort to inform all clients that had pending cases with Conflict that he was leaving and their point of contact would be Michael Tapling, with his email and phone number included.

337.     In fact, any emails sent to Mr. Komorek's Conflict email account, the sender received an auto reply to contact Mr. Tapling.

338.     Two clients of Conflict, upon learning of Mr. Komorek's departure contacted API and requested API's services.

339.     Each client advised in a written statement to be placed in their client file that attests to the fact API, nor anyone associated with API, solicited their business.

340.     Also, missing from the complaint, is the fact Conflict, after Mr. Komorek's departure requested him to contract back with Conflict to complete an investigation on behalf of a Conflict client and paid Mr. Komorek for his services and expenses.

341.     WAD Complaint #5 alleges malicious property damage, alleging "Mr. Komorek quit his employment and, while leaving the office, in the presence of other employees, defaced and damaged the office wall of that employee, despite this being against her wishes."

342.     This is not merely a misstatement of fact, it is a bold faced lie, and would be perjury if this complaint were a notarized statement.

343.     On or about December 14, 2021 all of the CI (US) staff were in the office of the only female employee at the time. A spirited discussion ensued on who was the best artist in the office.

344.     Komorek picked up a pencil and drew a caricature on the wall. Others joined in and drew their best picture on the wall, as well.

345.     The female employee even requested Komorek draw a palm tree, which he did.

346.     Everyone was jovial and the comment was made by one, "We ever leave this office space we'll have to paint that wall."

347.     No one was offended and it did not happen on February 25th as Komorek was quitting, as falsely alleged in the WAD complaint.

348.     At worst, this was a childish game of "who's the best" played out by several adults in the office.

349.     In fact, no one knew he had Komorek had resigned, until they received a late evening email on Friday,, Feb. 25th from Komorek announcing he resignation.

350.     In fact, the drawings were on the office wall when Defendant LaCorte visited the US office on or about February 28, 2022. LaCorte nor anyone else at CI raised any concerns, nor was Komorek ever asked about the drawings during his multiple exit interviews and follow up work with Conflict.

351.     Defendant Wes Bearden eventually sent a demand letter for $600.00 to Komorek to pay for the "repair" for the damaged wall.

352.     On or about April 14, 2022, General Counsel for API, Patrick Welsh, an Ohio registered attorney, spoke to Wes about the "bill" . This call also included Attorney James Davis, Komorek's then personal NC attorney.

353.     Bearden was advised what actually happened, yet he insisted the damage was done the day Komorek quit.

354.     Bearden was advised to provide an invoice of work actually done to "repair the wall". Once it was received, the bill for approximately $200.00 to paint the wall was paid on or about April 27, 2022.

355.     WAD Complaint #6, "Komorek may not currently meet the licensing requirements for WAD membership and may misrepresent Licensing status on public advertising.", citing WAD Active Membership Qualifications and Bylaws, Art IV.

356.     This allegation of "may not" and "may misrepresent licensing status" language is both very broad and vague.

357.     First, API is incorporated in Ohio, not Colorado as the complaint falsely states. Unlike Conflict International, API is diligently complying with state laws in order to solicit business in those states.

358.     At the time of the complaint, API was Registered as a Foreign Corporation Authorized To Do Business in NC, FL, NY, CO and CA.

359.     Not unlike Conflict, who has a "virtual office" in NYC, API also had a virtual offices in each state they were registered to do business – an industry standard practice.

360.     As such API had a legal and nationally recognized Registered Agent in each of those states, all on record with the Secretary of State in each state. They were  insured and had in house legal counsel.

361.     Komorek  was licensed in NC, and API was in Good Standing with the licensing board in the state. Komorek's NC license included reciprocity in multiple other states for investigation purposes.

362.     Komorek was also TSCM (bug sweeps) licensed, and in good standing, in NC.

363.     Colorado indeed let their licensing requirements sunset in 2021, so API was not required to be licensed in that state, just registered to do business.

364.     API did not solicit  consulting business or private investigation services in any state where they were not Registered To Do Business or not licensed as Private Investigators.

365.     API's website clearly is not advertising, but a landing page for their business – just like Conflict International has a website and lists their global locations and services, even though someone not in one of those locations or where they are not licensed or registered to do business can see the website.

366.    Ohio did not require API or Komorek be licensed to do PI work, unless private investigations were indeed being done within the state. API and Komorek did not conduct private investigations in any state until their respective PI licenses were issued.

367.    All of the above information was conveyed to the WAD Board via email to Defendant Robert Heales and Ron Russo. (see attached letter of July 8, 2022).

368.    Further evidence of unfair treatment of the Plaintiff was when he received the following email by Defendant Heales, that Plaintiff was to only communicate to him: "At this time there is no further communication with either party except by me as ED as I try to help keep the process moving or by Chuck if a question needs to be answered regarding procedure. Dan is recovering from a major surgery and our prayers are with him."

369.    This communication from Defendant Heales was in direct response to Plaintiff's below communications:

Mr. Dan Ruso
Chairman of the Board
World Association of Detectives

Mr. Matthias Willenbrink
Chairman of the Lower Court
World Association of Detectives

RE: Response to Mr. LaCorte's Letter of July 20, 2022

Gentlemen,

Before I respond to Mr. LaCorte's letter, I have a few administrative matters to address.

On July 11, 2022 per WAD bylaws and Roberts Rules of Order, I sent the following email, Motion of Personal Privilege to Dan, with a follow up email on July 13 to Bob Heales, Rockne Cooke, Alexey Solomandin and RP Chauhan requesting an update:

**Under WAD Bylaws Art XIV, Procedure, and Art III, Section 19, of Robert's Rules Of Order, I make a Motion of Personal Privilege, requesting the Chairman of the Board to order the recusal of the following:**

Robert Heales, Michel Hamel, Alexey Shcherbenev, Roger Bescoby, Jason Cohen, Thomas Mathiesen, Keith Schafferius, Philip Ryffel, Allen Cardoza, Vladimir Solomanidin, Fernando Molina, Mike LaCorte, Laura Giuliani, Dan Ruso, John Talaganis

from hearing evidence and from voting on the matter of discipline, either on the Lower Court or as part of the Grievance Committee of the Whole, because they have an interest in the outcome that directly affects me personally and monetarily.

These individuals are the complainants, or they have been offered and or accepted offers of monetary compensation from one or more of the complainants.

Also, the Complaint says the "the below signatories are Officers and Directors to Conflict International, Ltd., " thus they are vested with a direct, personal and corporate, interest in the sustaining of the complaint and should not be allowed to hear the complaint or vote on it as Board members on the Grievance Committee of the Whole.

Allowing any of the above named members to hear and vote on the issue of discipline  constitutes a significant appearance of impropriety and a violation of Due Process clause, Sections 1 and 8 of the Constitution of the State of Nevada, preventing me from receiving a fair and impartial hearing that may result in a deprivation of a property right (monetary income). (See Art XIV, Laws of the State of Nevada shall govern the handling of the business affairs of the Association)

Additionally, their participation would be a violation Art 1, WAD Code of Ethics requiring performing professional duties in accordance with the highest moral principles; Art IX, requiring a member to further an honest and legitimate manner of operation and Art VII, requiring all members of the association to protect the interest of our fellow members.

Per Robert's Rules of Order, this Motion must be ruled upon by the Chairman before any further action can be taken on the matter of the Ethics Complaint Regarding Stephen Komorek, as filed on June 23, 2022.

Please advise me immediately upon your ruling on this Motion.

Respectfully made,

Stephen Komorek


**From:** raheales@mindspring.com
**Date:** July 18, 2022 at 5:52:25 PM GMT+2
**To:** Stephen Komorek <skomorek@apiconsultinggroup.com>
**Cc:** Chuck McLaughlin <McLaughlinPI@gmail.com>
**Subject: WAD**

Hi Stephen,

The Lower Court was already convened with trusted members of our Board of Directors as per our Bylaws. There is nobody on the Lower Court who is affiliated with Conflict International. They are in the midst of reviewing everything submitted now.

When the time comes for this matter to be heard by the Grievance Committee of the Whole, nobody on the Board who is affiliated with Conflict International or your organization will participate. That only makes sense and had already been decided.

At this time there is no further communication with either party except by me as ED as I try to help keep the process moving or by Chuck if a question needs to be answered regarding procedure. Dan is recovering from a major surgery and our prayers are with him.

This matter is being handled fairly and professionally by your peers.
*Best Regards,*
*Bob Heales*
*Executive Director, World Association of Detectives*
*Past President; WAD, NCISS, and PPIAC*
*bob@wad.net or raheales@mindspring.com*
*www.wad.net*
*Cell 1-218-866-0336*

      *WAD Administration 1-443-982-4586*

Yet I find out today Dan is back to full capacity. (see Exhibit 1, email from Dan)

My Motion can only be ruled upon by the Chairman of the Board.  The Executive Director has NO Authority in discipline matters other than to forward the complaint to the Chairman of the Board. ( SEE Article VI Section 3c, and section 6, as to the duties of the ED, which are limited to assist in daily operations; and Article XII section 3, and 5) I am still waiting on a formal Ruling on my Motion and by Roberts Rules of Order, which are specified in our Bylaws as the governing rules for our association, no further action can be taken by the Board, Lower Court or Grievance Committee until such ruling is made.

Furthermore, our Bylaws specify that the complaint is to be sent to the Chairman of the Lower Court, who will distribute copies to the Lower Court appointees. Sharing the Complaint with any other member of the organization, and specifically the Grievance Committee Chair is both a violation of our Bylaws and unduly prejudices my case and the ability to get a fair and impartial hearing on the allegations.

**Also note, Article VI section 3B clearly states "The Chairman of the Board is also the Chairman of the Grievance Committee of the Whole."  With all due respect, who and**

**how was Chuck appointed to some official capacity as noted in Bob's email, yet Matthias is not mentioned at all?**

As a reminder and to ensure compliance with our Bylaws, Article XII Section 2.  Five (5) members of the Board of Directors, appointed by the Chairman of the Board, shall constitute a Lower Court for any hearing and decision on any given grievance or ethical issue. The Chairman or Presiding Officer for the Lower Court shall also be named by the Chairman of the Board of Directors.  The remaining Board of Directors not serving on the Lower Court will serve as the Grievance Committee of the Whole. A quorum for the remaining Board members on this committee will need to be at least 11 members (Article IX section 6)

A **Point of Order,** under Robert's Rules of Order, is appropriate here – who and how was the Lower Court appointed if not by the Chairman of the Board? If appointed by the ED, this is a clear violation of our Bylaws.

While the Article XII, section 8, does not specify the percentage of votes in the Grievance Committee of the Whole  are required in rendering their decision, it is important to note for expulsion of an elected Officer or Director, in Article XIII section 12, appeal of the decision of the Grievance Committee of the Whole, requires a two-thirds (2/3) vote of the Board of Directors. I am an elected Officer.


Please advise, in writing,  the ruling and grounds for same on my Motion of Personal Privilege and the above new Point of Order..

On to the response to Mr. LaCorte's letter and attached exhibits:

I am going to make this simple and to the point, as the child like tantrum of the folks at Conflict is simply retaliatory efforts to slander me, my company and business partner – while at the same time trying to destroy  my US Constitutional and State of Nevada Constitutional protected property right to earn a living. I say Nevada, because, if you read our Bylaws, that is the state laws under which our association operates.

Item 1  Civil lawsuit claims:
This case involved a disgruntled employee of a client of my employer at the time.
We were hired to interview employees as a part of the client's defending themselves in a wrongful termination claim being pursue by the ex-employee.
The former employee then filed a law suit alleging a host of false allegations.
Because of the nature of the nature and notoriety of the client, the client's attorneys filed and were granted a Motion to seal the case.
The case was dismissed with prejudice and there was never any finding of wrongdoing by me or my employer.

The attempt to portray this any other way by LaCorte or others is disingenuous at best, demonstrably and objectively false at worse. I suggest it is the latter.

Item 2  Placing other members in harm's way:

In 2021, the client that Conflict was working for had hired us because she was the victim of an extortion/harassment scam by the individual who sent the letter to THE HUSBAND of the client and is attached as exhibit B in LaCorte's Complaint.
On Jan. 19, 2022 the subject of the investigation escalated his tactics and scam. On Jan. 20, 2022 Client forwarded the email to CI via my work email. I immediately called the client and after a brief discussion and at her request, I referred her to a highly reputable law firm in the NY City area (where client has a second residence and the subject also lived).
On Jan. 21, 2022 the client retains the law firm.
On Jan. 25, 2022 the client gave to the attorney a time line of events and line by line rebuttal/denial of every allegation made by the subject as being false and a furtherance of the subject's harassment of her. As a part of that process, and at the request of the client, we provided the attorney documentation from our investigation that supported the client's claim of harassment.
On Jan. 27, 2022 the attorney sent a Cease and Desist Letter to the subject. This was done via registered mail, certified mail, and Fedex.
Conflict International has ALL the emails and correspondence to substantiate the above time line and FACTS of the case. So does the attorney and the client.
I personally reached out to contacts within NYPD and inquired as to any complaints against me or Conflict International from the subject. There were none, because they never existed in the first place.
Again, as I stated in my original rebuttal, Conflict UK and US were fully informed of the letter and allegations well before the Feb. surveillance for pattern of life on the subject. This was the next phase in the original investigation that had now been escalated by the subject by sending the email to the husband. Our client is in her 70's and was legitimately concerned for her safety and welfare and instructed us to do more to bring this harassment to a stop.
I created a plan of action  and communicated it to the US and UK staff. The plan involved a surveillance team of NY licensed investigators, which included me, as I was licensed in NY.
Through a series of emails and phone conversations, emails of which Conflict has, I was relieved of being involved in the surveillance and replaced by a non-licensed investigator from the UK office.  My written briefing on the operation was revised by said investigator and he deleted the two NY licensed investigators I had chosen to subcontract to be part of the team. We had scheduled a Tuesday briefing on the case with the UK investigator and US team, and he FAILED to show up for the briefing call. This left only one NY licensed investigator on the ground.
Under LaCorte's direct instructions, the team from the US office was to be: Mike Tapling (who is NOT licensed in any state as a private investigator), a NC licensed investigator

and a NY licensed investigator. As I was relieved from having any participation in the operation, directly or indirectly, and was suffering a great deal of humiliation and stress from being relieved of my duties, I put in for and had approved my first use of vacation time in 3 years with CI, which was to be the week of the surveillance.

The attempt to portray this any other way by LaCorte or others is disingenuous at best, demonstrably and objectively false at worse. I suggest it is the latter. This is clearly an unethical and dishonest attempt by LaCorte and others who have singed this complaint and rebuttal to use WAD as a means of retaliation because I left the company and they eventually lost this client.

Which brings me to **item #4** – alleging I "used my privileged position as a senior leader in Conflict" "and took that client from us."

Nothing is further from the truth – in fact, unequivocally these statements are demonstrably and objectively false. Every client of Conflict at the time of my resignation was sent an email (Conflict has same, as the emails are in the company Google drive but apparently has chosen not to disclose them to the Lower Court), advising them I was no longer with the company and the new point of contact was Michael Tapling, with his email address included.

After receiving that email, several clients contacted me on my personal cell phone and wanted to know if I would still take care of their investigations or future needs for an investigator. I reiterated, on their current cases the point of contact was Tapling. Those that did retain my new company, did so at their request and we have on file their written/signed statements that we, as a company or me personally, DID NOT solicit their business. (Exhibit 2)

Again, this complaint is retaliation for leaving the company and Conflict losing clients because they could not assure client services and satisfaction. Secondly, there is no non-compete agreement between me and Conflict. My departure was my right. My informing clients of their new point of contact was the right thing to do and I did it. The fact that some clients did not want to continue the services of Conflict is NOT my fault. To say I "took" their clients is false, unethical, and a dishonor to this association and profession.

As to allegations of misconduct in returning the phone and laptop. One, there were no written and approved policies and procedures at Conflict during my tenure. We had only past practices to rely on.

Past practice regarding laptops and phones when an employee left the company was to wipe them and then reissue them to another new or existing employee, or placed in equipment inventory. For example, David Johnson left Conflict to go to work for a client of Conflict. He turned in his laptop and phone. We did not download or "dump" anything

off either piece of equipment. Rather, I wiped the laptop and then gave it to Michael Tapling, who replaced DJ. I wiped his phone and placed it in inventory storage, eventually issuing it to Pat Welsh when he came on board as an employee. Since we had no spare laptops, we bought a new one for Mr. Welsh.

Also, in this section I am accused of breaching a fiduciary duty to Conflict, because I was an employee, Officer and or Director. In the US, corporate legal principles and case law – shareholders elect the Board of Directors, Directors appoint Officers and all of this to be legally binding upon the parties with respect to liability and establishing fiduciary duties must be documented in the Corporate Minutes of the corporation. No such Minutes have been produced.

EVEN IF they were, here is the current case law in New York, the State of Incorporation of Conflict International, Inc. On the issue of fiduciary duty and starting a competing business:

Examples of actions that have been found by courts in New York to be merely preparatory and not in breach of duties to the current employer include:
Incorporating a later competing business[1];
Filing for and obtaining trademark registration[2]; and
Entering into negotiations for and purchasing a competing business.[3]
[1] Schneider Leasing Plus Inc. v. Stallone, 172 A.D.2d 739, 741, 569 N.Y.S.2d 126, 128 (2d Dept. 1991).
[2] Abraham Zion Corp. v. Lebow, 593 F.Supp. 551, 571 (SDNY 1984).
[3] Tulumello v. W.J. Taylor Intern. Constr. Co. Inc., 84 A.D.2d 903, 446 N.Y.S.2d 673, 674 (4th Dept. 1981).

Item 3  There were, over my time at Conflict, clients who advised they did not want written reports on their instructed matters. Rather, they want verbal updates and would request a written report if needed. This is a clients right and is codified in North Carolina law on Private Investigations, 74C and 14B, reporting requirements and intellectual property.

Our contracts would reflect the instructions of the client in this regard and contained the following or similar language.
**2.0 Reporting**
We will use our best efforts to provide you our report as soon as possible after receiving instruction to begin. Reports will be given verbally or sent through email.
**4.0 Communication**
All of your files, confidential reports, and supporting documentation will be referenced as 'XXXXX". You will be updated of case progression by direct communication with me. I will be your point of contact throughout this case and contactable directly via email at S.komorek@conflictinternational.com or by phone at 336-554-5966 (cell).

Feel free to ask LaCorte to provide the redacted contract of March of 2021, with the high net worth client I allegedly "took", and you will, I'm sure see this very same language in the contract.

Please re-read my original response to allegation 3 in the Complaint. I do deny any unprofessional, unethical or immoral behavior. The one employee, Officer Manager and Bookkeeper, I had recommended be terminated for her inability to perform her job was kept at the direction of LaCorte. She later quit for a HIGHER paying job elsewhere.

The other employee quit, was talked into returning by LaCorte via personal phone call and then later quit again. She was being held accountable to performing her job and had emotional issues and could not take the stress and demands of our industry. I did not create a hostile work environment, there are no complaints filed against me and LaCorte is cherry picking resignation letters and putting his own spin on them post resignation.

Item 5  Damage to property.

Drawing on the office wall, again, was a childish act. It was not malicious or in any stretch of the imagination damage. It was done in pencil and was painted over. It was done in December of 2021 – not "Just prior to Mr. Komorek's departure on February 25th.", as alleged in the original complaint. Rather convenient that LaCorte has now changed the "facts" of his complaint, once called on the carpet by the truth in my original response.

Also rather disingenuous of LaCorte is to include a phone picture of me drawing on the wall. Why did he not include the pictures of the other employees in the office who drew on the wall as well? Where is their "affidavit" of being shocked and force "to tolerate bearing the costs of property damage caused by another member."?

Again, demonstrably and objectively false accusations of misconduct.

Item 6. "Potential Licensing Issues"

"As we claimed, API and Komorek *may* have licensing issues." How nice to throw out a broad accusation, knowing the Board is not required to investigate the claim.

In my original response, my personal and company PI licensure in NC is provided. There is NO "Potential" licensing issue for purposes of WAD membership. I/we are fully PI licensed and in Good Standing (also provided in original response) in NC.

Again, a demonstrable and objectively false claim.

As to other states "may" have issues:

**API is registered as a foreign corporation authorized to do business, as is required under state law, in the following states: New York, North Carolina, Florida, Colorado, and California. (Exhibit 3)**

**We have Registered Agents and a virtual office in each of these states, as required by their state laws. We are permitted to do and solicit business in these states – for consulting and training or other lawful services, which are offered on our web site. WE DO NOT and HAVE NOT solicited investigation business in any state we are not PI licensed.**

**I find this complaint not only false, but extremely hypocritical considering Conflict UK has openly, and rather proudly, shared their soliciting of investigative and due diligence services in Florida, Illinois and California – states in which they are neither PI licensed nor registered to do any business activities. (Exhibit 4)**

**IN FACT, CONFLICT INTERNATIONAL, LTD IS NOT REGISTERED ANYWHERE IN THE US TO DO BUSINESS. THE MERE FACT LACORTE OWNS BOTH COMPANIES DOES NOT GIVE HIM THE RIGHT TO CONDUCT BUSINESS ON BEHALF OF THE UK COMPANY HERE IN THE UNITED STATES. ONE MIGHT RESEARCH THE STATE LAWS FOR "POTENTIAL" CIVIL AND OR CRIMINAL SANCTIONS FOR DOING SO.**

A few closing points for your consideration:

Albeit every allegation in the complaint is demonstrably and objectively false to begin with, this complaint is clearly not a WAD membership issue – it is an employment issue, that if any of it were true, would be litigated in the civil courts of the United States.

The so called "affidavits" attached as exhibits are completely inadequate and of no legal effect in the United States. Affidavits, to have the  effect of being sworn testimony or statements in a legal matter in the United States, including Nevada, have to have very specific language of attesting to their truthfulness, must be signed in front of a Notary Public and have civil and or criminal penalties if the sworn statement is found to contain false or perjured claims.

What is attached is nothing more than self-serving statements made by employees who are dependent upon Conflict for a pay check. NOTABLY ABSENT IS ANY SUCH STATEMENT BY ANOTHER EMPLOYEE WHO WAS PHYSICALLY PRESENT TO ALL THE ALLEGED MISCONDUCT.

Also not disclosed, one exhibit statement is from LaCorte's brother-in-law.

While not listed in the original complaint, but slyly added to page 5 of LaCorte's July 20, 2022 response to my rebuttal is this statement," While this complaint has been pending, we have been approached by the United States IRS in relation to failures to pay appropriate taxes during the time such submissions were Mr. Komorek's responsibility. While employed at Conflict, Komorek advised that he had hired a bookkeeper to address payroll and tax in the US. No record of any such bookkeeper exists."

This is a blatantly false statement.

The employee who quit for a higher paying job was the Office Manager, tasked with bookkeeping functions – which she routinely screwed up and is why I recommended her termination to LaCorte. Once she quit, with full knowledge of LaCorte and Conflict US accountant, I registered with QuickBooks, an online accounting and payroll service, to do our payroll and tax related functions. (Exhibit 5

LACORTE IS FAILING TO DISCLOSE THAT THE ACCOUNTANT FOR CONFLICT INTERNATIONAL, INC IS MITCHELL D. MILLER, OF WIEINBERG, LIEBERMAN AND CO, CPA, IN FAIRFIELD, NJ. Miller has been their accountant since before I was hired. I can personally recall Conflict International getting, almost quarterly, notices and letters from the IRS, about deficiencies in the TAX RETURNS FILED BY MILLER. If I had to estimate, there are over 1000 pages of correspondence between me and Miller about IRS issues that preceded me and continued on after I was hired., all of which Conflict would have on their Google Drive.

As I close, I will quote LaCorte, I read his Personal Statement dated July 19,2 022, with "utter disgust'. While he pats himself on the back for how gracious and how much respect he showed me, I would remind him and share with the Board and Lower Court this tidbit of fact: when I came on staff at Conflict, their financial condition was going in the red (i.e. a loss). In fact, Conflict US had to get a loan from UK office just to stay afloat. Fiscal year 2021, I personally brought in gross revenue exceeding $2,000,000.00 (Two Million USD).

This whole complaint is merely a retaliatory smear campaign to ruin me personally and professionally, simply because I left and clients who respected and appreciated my work ethic and results later retained my new company, without any solicitation, rather than to stay with Conflict.


Respectfully submitted,


Stephen Komorek
Further communication from Plaintiff to the Presiding Officer of the Lower Court was sent:

Letter of August 5, 2022:

To: Matthias Willenbrink
Presiding Officer of the Lower Court
World Association of Detectives
From Stephen J. Komorek
Member and Board of Director's Member
World Association of Detectives SUBJECT: Matter before the Lower Court
Sir:
I am in receipt of your correspondence dated August 5, 2022 at 10:27 am EDT,
responding to my email request on the time line of the Lower Court pursuant to our
Bylaws.
Specifically:

**ARTICLE XIII – DISCIPLINE**

Section 3. The Lower Court shall receive and act upon such grievances or ethical issues
as brought to their attention by the Executive Director. The Lower Court should then
submit its findings and recommendations to the Grievance Committee of the Whole for
disposition.

I am confused by your response, in that you state the Lower Court has not reached a
decision, yet you expect the matter to go before "the entire board next week, except
yourself, Mike LaCorte and all board members who are employed by either you or Mike."
Under Robert's Rules of Order, I have a right to vote on my own behalf as a Board
Member. Secondly, it is not simply a matter of any Board member "employed" by
LaCorte or myself (of which there are none employed by me).

I made the following Motion of Personal Privilege, under Robert's Rules of Order as to
whom should be excluded from hearing evidence and or voting on discipline and I renew
it here:

**Under WAD Bylaws Art XIV, Procedure, and Art III, Section 19, of Robert's Rules Of
Order, I make a Motion of Personal Privilege, requesting the Chairman of the Board to
order the recusal of the following:**

**Robert Heales, Michel Hamel, Alexey Shcherbenev, Roger Bescoby, Jason Cohen,
Thomas Mathiesen, Keith Schafferius, Philip Ryffel, Allen Cardoza, Vladimir
Solomanidin, Fernando Molina, Mike LaCorte, Laura Giuliani, Dan Ruso, John Talaganis
from hearing evidence and from voting on the matter of discipline, either on the
Lower Court or as part of the Grievance Committee of the Whole, because they have
an interest in the outcome that directly affects me personally and monetarily.
These individuals are the complainants, or they have been offered and or accepted
offers of monetary compensation from one or more of the complainants.
Also, the Complaint says the "the below signatories are Officers and Directors to
Conflict International, Ltd., " thus they are vested with a direct, personal and
corporate, interest in the sustaining of the complaint and should not be allowed to
hear the complaint or vote on it as Board members on the Grievance Committee of the
Whole.**

**Allowing any of the above named members to hear and vote on the issue of discipline constitutes a significant appearance of impropriety and a violation of Due Process clause, Sections 1 and 8 of the Constitution of the State of Nevada, preventing me from receiving a fair and impartial hearing that may result in a deprivation of a property right (monetary income). (See Art XIV, Laws of the State of Nevada shall govern the handling of the business affairs of the Association)**

**Additionally, their participation would be a violation Art 1, WAD Code of Ethics requiring performing professional duties in accordance with the highest moral principles; Art IX, requiring a member to further an honest and legitimate manner of operation and Art VII, requiring all members of the association to protect the interest of our fellow members.**

Secondly, from your email it sounds like the Lower Court had already reached a decision and recommendation (or as you call it options) after receiving LaCorte's rebuttal to my Answer to the original complaint, but before receiving my Response to his Rebuttal. Please advise when you received my Response.

Thirdly, I am on the Board of Directors, and as such, I am specifically requesting to be advised of who makes up the Lower Court.

Also, I specifically demand, as a Board of Directors Member, to receive a copy of the Lower Court Decision and Recommendation – see Section 3. The Lower Court shall receive and act upon such grievances or ethical issues as brought to their attention by the Executive Director. The Lower Court should then submit its findings and recommendations to the Grievance Committee of the Whole for disposition.

And Section 8. The Grievance Committee of the Whole, meaning all of the Board Members who otherwise did not sit as the Lower Court, shall render their decision within a reasonable time as the mails allow. All decisions shall be made known to all interested parties, the Officers and all Board Members for their appropriate actions and attentions.

The repeated disregard for and violation of our Bylaws, Robert's Rules of Order and my personal and property rights as guaranteed by the US Constitution and the Constitution of the State of Nevada, under which our Bylaws state we are to operate has got to stop – see **ARTICLE XIV – PROCEDURE**

Section 1. The current edition of Robert's Rules of Order shall govern the parliamentary conduct of all conferences, meetings, hearings, and administrative functions, rulings, and decisions, except as otherwise provided herein. The laws of the State of Nevada shall govern the handling of the business affairs of the Association.

I fully expect all this to fall on deaf ears, but I am preserving the record of misfeasance, malfeasance and nonfeasance that has permeated this whole matter.

I look forward to your complying with my above request for documents and receiving a copy of the Lower Court's Findings and Recommendations.

Respectfully, Stephen J. Komorek


370.    The Presiding President never responded. Instead, Komorek then received the following email from Robert Heales:

On Aug 23, 2022, at 3:55 PM, raheales@mindspring.com wrote:

Dear Stephen,
As you are aware, the voting members of the Board of Directors met today in a Zoom meeting. Those people are the Grievance Committee of the Whole and I write this message on their behalf.  The meeting started with 25 attendees.  Some had to drop off by the time we got to voting, so we then had 20 attendees. Members of the Lower Court did not vote. As previously explained, Mike LaCorte, you, and others involved with Conflict International did not receive an invitation to the meeting. The meeting lasted for 2 hours and 15 minutes.
The Lower Court did not find you guilty on every complaint. After a great deal of discussion and deliberation, the Grievance Committee of the Whole voted to reprimand you and suspend you from holding office or an appointed position for 5 years. This means you are being removed from the Board of Directors effective today, August 23rd, 2022. You are also being removed from the online membership directory and listserv until such time as you present a valid Ohio PI License. You must produce a valid Ohio PI License by October 31st, 2022 or you will be expelled from membership.

The other option was Expulsion from Membership, but that did not have as much support as the penalty that most agreed on.
Throughout this process I have seen thoughtful, thorough, and careful discussions by all parties as they attempted to be fair in their evaluation of all matters presented. Many, many hours were put into this.
Since you cannot participate in the Board Meetings, should you decide against attending Aruba, please let me know at your earliest convenience and we will arrange a refund for your registration and sponsorship.
Sincerely,
*Bob Heales*
*Executive Director, World Association of Detectives*
*Past President; WAD, NCISS, and PPIAC*
*bob@wad.net or raheales@mindspring.com*
*www.wad.net*
*Cell 1-218-866-0336*
*WAD Administration 1-443-982-4586*

371.      The conduct of the Defendant LaCorte and Conflict International above set forth

constitutes fraud.

372.      As a result of the fraud committed by the Defendants Plaintiff has been damaged

in an amount to be determined at trial not less than $5 million.

373.     In addition to such damages, Plaintiff seeks punitive or exemplary damages as a result of the egregious nature of the fraud committed Defendants Conflict International, Inc., and Michael LaCorte.

## COUNT VII

### TRADE LIBEL

374.     The allegations set forth in paragraphs 1 through 373 of this Complaint are re-alleged as if fully re-written herein.

375.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

376.     The actions of Defendant Conflict International, Inc., and the other Defendants as above set forth constitutes trade libel as the Defendants knowingly published false matters that are derogatory to the Plaintiff's business and which were calculated to prevent or interfere with relationships between the Plaintiff and others to the Plaintiff's detriment.

377.     The statements knowingly published by Defendant Conflict International, Inc., and other Defendants were false, were published to third persons, were published with malice , and resulted in damages to the Plaintiff.

378.     As a result of the trade libel committed by the Defendants Plaintiff has been damaged in an amount to be determined at trial not less than $5 million.

## COUNT VIII

### LIBEL PER SE

379.     The allegations set forth in paragraphs 1 through 378 of this Complaint are re-alleged as if fully re-written herein.

380.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

381.     The actions of Defendant Conflict International, Inc., and the other Defendants as above set forth constitutes libel per se.

382.     As set forth above, the Defendants made written defamatory statements of fact concerning the plaintiff, which were published to third persons, were published, with actual malice , which defamatory statements were false, and which defamatory statements were per se actionable, which statements have harmed and will continue to harm the Plaintiff's reputation, including lowering Plaintiff's reputation and/or deterring clients and/or other business associates and prospective clients and other business associates from retaining, associating and/or dealing with Plaintiff.

383.     Defendants' conduct amounts to libel per se under the law and damages are presumed.

384.     As a result of Defendant Conflict International, Inc., Defendant Michael LaCorte and other Defendants' actions constituting liber per se, Plaintiff has been damaged in that Plaintiff has suffered humiliation, embarrassment, injury to reputation and standing in the community, mental suffering, and anguish and anxiety, in an amount to be determined at trial believed to be not less than $5 million USD.

385.    In addition to such damages, Plaintiff seeks punitive or exemplary damages as a result of the egregious nature of the fraud committed Defendants Conflict International, Inc., and Michael LaCorte and other named Defendants.

## COUNT IX

### INJURIOUS FALSEHOODS

386.    The allegations set forth in paragraphs 1 through 385 of this Complaint are re-alleged as if fully re-written herein.

387.    This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

388.    The actions of Defendant Conflict International, Inc., and the other Defendants as above set forth constitutes Injurious Falsehoods.

389.    Defendant Conflict International, Inc.,, Defendant Michael LaCorte and other Defendants knowing published false and derogatory matter with respect to Plaintiff's business of a kind calculated to prevent others from dealing with the Plaintiff and his business or otherwise intending to, and I fact, interfering with Plaintiff's relations with others, to Plaintiff's detriment.

390.    Defendant Conflict International, Inc., and Defendant Michael LaCorte and other Defendants conduct as above described constitutes the tort of injurious falsehood, in that the statements published by Defendants via social media sites, electronic communication platforms and administrative complaints were false and fraudulent, were published to third persons, with malice, and resulted in special damages.

391.    The statements were intended to, and did denigrate the quality of plaintiff's business and services.

392.     The false statements made were intended to and did cause the plaintiff to lose access to professional and industry resources and services needed to provide international services on behalf of current or prospective clients.

393.     The false statements made were intended to and did cause the plaintiff to lose the ongoing negotiations to acquire another professional company and thereby loss of business opportunities domestically and internationally.

394.     As a direct result of Defendant Conflict International, Inc., Defendant Michael LaCorte and other Defendants' actions committing torts of injurious falsehood, Plaintiff has been damaged in an amount to be determined at trial believed to be not less than $5 million.

395.     Defendant Conflict International and Defendant Michael LaCorte and the other Defendants actions as above set forth were undertaken with malice, and as a result thereof, Plaintiff should be awarded punitive damages in an amount deemed appropriate.


## FACTS COMMON TO TORTIOUS INTERFERENCE WITH EXISTING AND PROSEPCTIVE BUISNESS RELATIONS IN FOLLOWING COUNTS X AND XI

396.     Plaintiff has spent the last several decades in the service of his country, both while enlisted in the US Army and the National Guard, as well as in working relationships with multiple US Government entities and some foreign entities.

397.     Over the course of those years Plaintiff has been a part of numerous investigative and or consulting enterprises, both in the private and public sectors.

398.     Plaintiff has been a licensed Private Investigator in one or more states since 2013 and has cultivated numerous existing business and professional relationships, as well as belonging to several prestigious industry associations/organizations.

399.     Once such organization Plaintiff Komorek belongs to is the World Association of Detectives, Inc., (WAD), with a membership exceeding 900, representing close to 90 countries.

400.     Plaintiff has been a member since 2016, and has served as a US Ambassador, Sergeant at Arms and a Board Member during his membership.

401.     WAD's own website states the benefits of membership include: "The W.A.D. is an outstanding and leading international organization whose members are the leaders of their profession in their respective communities and countries. Millions of dollars in exchange work is referred annually! JOIN NOW"

402.     Plaintiff consistently participated in WAD association activities and in referring and getting referral work with various international and domestic members, estimated to be in excess of $500,000.00. Plaintiff was on track to rise even further up the organizational leadership ladder, hoping one day to serve as its President.

403.     Plaintiff also was featured in WAD material for publication to members, including when WAD was under the leadership of Defendant LaCorte, and taught a multi- part series on Human Lie Detection to WAD members, all as a result of his membership and leadership positions within WAD.

404.     Defendant Conflict International Inc., Defendant Michael LaCorte, Defendant James W. Bearden, and Defendant JW Bearden Investigative Agency hold Executive level and influential positions within WAD and other industry associations that Plaintiff is or has been a member of.

405.     Plaintiff has business relationships and prospective business relationships with clients in both the private and public sectors, domestically and internationally, including law firms, individuals, businesses, and associates who have been exposed to wrongfully created,

posted, published and or transmitted by Defendant Conflict International, Inc., Defendant

Michael LaCorte and other Defendants.

## COUNT X

**TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONS**

406.     The allegations set forth in paragraphs 1 through 405 of this Complaint are re-

alleged as if fully re-written herein.

407.     This Count is against Conflict International, Inc., and other Defendants, who are

employed, associated with or agents of with the enterprise.

408.     Defendant Conflict International Inc., Defendant Michael LaCorte, and Defendant

James W. Bearden have instituted or assisted in instituting fraudulent, malicious and frivolous

administrative complaints and/or civil litigation complaints against the Plaintiff and his business,

all for the purpose of harming his reputation, business opportunities and retaliation for leaving

the employ of Defendants.

409.     The civil lawsuits are displayed on the internet when one searches the name of

Plaintiffs.

410.     One  such internet search reveals the following: Offshore Alert.com

411.     "Complaint "about a relatively inexperienced private investigator who was hired

by Plaintiffs, a London, England private investigations firm, to help expand their business in the

United States" but "resigned without warning in the middle of the night taking with him clients,

trade secrets, employees, and information" in Conflict International Inc. and Conflict

International Ltd., of England v. Stephen Komorek and API International Consulting Group Inc.

412.     Defendant Bearden contacted a law firm client of Plaintiff and made extremely derogatory and false claims against the Plaintiff, disparaging his reputation, integrity and truthfulness.

413.     The client advised the Plaintiff of the contact and questioned Komorek on the validity of the accusations.

414.     Defendant McLaren contacted a sub-contracted investigator working on a case for a client of Plaintiff, and former client of Conflict International, and made false and derogatory statements about the Plaintiff, disparaging his reputation, integrity and truthfulness and vouching for the integrity of the subject of the investigation, another Defendant in this case, Victoria Pressly, for the purpose of harming the Plaintiff's business relationship with the sub-contractor and the client of Plaintiff.

415.     The sub-contractor advised the Plaintiff of the contact and questioned Komorek on the validity of the accusations.

416.     Defendant Pressly engaged in criminal harassment of an existing client, making false and derogatory statements about the Plaintiff, in an attempt to injure the Plaintiff's reputation and to encourage the client to discontinue the business relationship with the Plaintiff and his business.

417.     The client advised the Plaintiff of the contact and questioned Komorek on the validity of the accusations.

418.     On or about March 4, 2024, Plaintiff Komorek was contacted by agents of a Federal Law Enforcement Agency that he has had a business relationship with for over 6 years, including pre-employment with Defendant Conflict International, during his employment and post-employment. During that contact Komorek was advised of the following:

419.     "On or about October 2022, a federal law enforcement special agent out of Texas contacted Conflict International office in NY asking to speak to Stephen Komorek in regards to a case he had been working with them since 2020. Conflict VP Joseph Hill, in North Carolina answered the NY forwarded phone call from CI virtual office, and told the special agent "Stephen was fired" "He is untrustworthy" and "unreliable". The special agent's squad was seeking Stephen Komorek's continued assistance on an international case he had been working on with them since 2020.  Due to the claims made by Joe Hill of Conflict, the Texas office ceased attempting to communicate with Mr. Komorek. It was reported to Komorek, that  the Agent in charge of the criminal case that Komorek was assisting on stated, "The intelligence and reporting he provided was very good, but due to the comments about him, the the squad working on that case declared him a "dead end", and had to seek out other sources to work with to get additional information."

420.     Defendant Conflict International, Mike LaCorte and Joe Hill knew Komorek had been working with the federal agency on this specific case, knew Komorek had not been fired but resigned, and that they had Komorek's current business contact information and intentionally did not provide same to the caller. All was done to intentionally disparage Komorek's reputation and ruin his business working and professional relationship with a long standing business relationship.

421.     Defendant Conflict International, Inc., Defendant Michael LaCorte and the other Defendants know of existing relationships between the classes of clients and persons identified above and Plaintiff and his business, and their wrongful, malicious and intentional conduct in tortuously interfering with Plaintiff's contractual and potential contractual relationship with the

foregoing consumers, professionals, individuals and other business associates has been wrongful, intentional and or criminal, as described above.

422.     There is no privilege or justification for Defendants' conduct.

423.     As a result of Defendants' wrongful, intentional, and malicious tortuous conduct and criminal conduct as set forth herein, Plaintiff's existing business relations and the persons identified above were exposed to false, derogatory, negative and intentionally misleading "information" about Komorek and his business  and caused them to question their business relationship with the Plaintiff and his business.

424.     As a result of the actions described above, including, without limitation, the criminal conduct and wrongful, malicious and intentional tortious  conduct, Defendant Conflict International, Inc., Defendant Michael LaCorte and the other Defendants knowingly and tortuously interfered with Plaintiff's valid business relations and contracts with its existing clients and others with whom Plaintiff and his business had valid business relationships.

425.     In so doing, Defendants acted with specific purpose and/or intent to harm Plaintiff and did so without proper justification, privilege or consent.

426.     The statements made, created, disseminated, transmitted or otherwise distribute by Defendants about the Plaintiff and his business were false.

427.     As a result, Plaintiff has suffered actual damages including, but not limited to, damage to Plaintiff's business relations and trust with his clients. Accordingly, Defendants'' actions constitute tortious interference with actual business relations under the common law.

428.     Plaintiff has no adequate remedy at law for the foregoing criminal, wrongful, malicious and intentional conduct of the Defendants.

429.    Defendants' intentional interference with Plaintiff's existing business relations has damaged Plaintiff in an amount to be determined at trial.

## COUNT XI

### TORTIOUS INTERFERENCE WITH PROSEPCTIVE
### BUSINESS RELATIONS/ECONOMIC ADVANTAGE

430.    The allegations set forth in paragraphs 1 through 429 of this Complaint are re-alleged as if fully re-written herein.

431.    This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

432.    Defendant Conflict International Inc., Defendant Michael LaCorte, and Defendant James W. Bearden have instituted or assisted in instituting fraudulent, malicious and frivolous administrative complaints and/or civil litigation complaints against the Plaintiff and his business, all for the purpose of harming his reputation, business opportunities and retaliation for leaving the employ of Defendants.

433.    The civil lawsuits are displayed on the internet when one searches the name of Plaintiff.

434.    One  such internet search reveals the following: Offshore Alert.com "Complaint "about a relatively inexperienced private investigator who was hired by Plaintiffs, a London, England private investigations firm, to help expand their business in the United States" but "resigned without warning in the middle of the night taking with him clients, trade secrets, employees, and information" in Conflict International Inc. and Conflict International Ltd., of England v. Stephen Komorek and API International Consulting Group Inc.

435.     The most recent instance of tortious interference with prospective economic advantage occurred on or about May, 22, 2023, directly tied to the abuse of process and lawsuit filed by Defendant Conflict International, Inc. and Conflict International Ltd, a UK entity, against the Plaintiff.

436.     On or about July 19, 2021, while still in the employ of Defendant Conflict International, Inc., Plaintiff received a written invitation to be a contributing author to an academic book **The Art Of Investigation Revisited: Practical Tips from the Experts,** CRC Press, Taylor & Francis Group, released September 12, 2023. The invitation included the following:

Dear Stephen

Bruce Sackman and I would like to invite you, as an esteemed member of the investigative community, to write a chapter in our new book, The Art of Investigation II.

The Perks: If you have ever wanted to be a published author for a leading press, this is your chance! For those of you who have already published, this is an opportunity to be part of a unique collaboration among esteemed colleagues. Bruce and I have also actively promoted the first book via speaking engagements and podcasts (and that will continue with the second book) which results in a lot of promotion for you and your work. For instance, I recently spoke about the first book at the ACFE conference (where I named each author and discussed their work) and over 1300 people tuned in!

We will also host a public book signing, giving you the opportunity to engage with the investigative community. We will also provide you with a complimentary copy of the published book, upon completion. Although there is no financial compensation offered (which is common in academic projects), as you see there are many strong advantages to participating!

Best,
Chelsea and Bruce
Editors, The Art of Investigation II

437.     Among other the things, the on-line Abstract of the book states:

The Art of Investigation Revisited: Practical Tips from the Experts examines the qualities required to be a professional, thorough, and effective investigator and is a follow up to the authors' highly touted book, *The Art of Investigation* (2019). This book features a wholly new line-up of investigators, experienced professionals in the field, who delve into the "soft skills" that make an investigator effective. Each chapter examines a specific quality required to be a professional, thorough, and—most importantly—successful in this challenging discipline.

The editors, and contributing authors, are all top in their field and bring a wealth of real-world knowledge and experience to the subject. While several publications exist on the procedures and steps of an investigation, few books cover the creative and intuitive skills required. Such traits are necessary to continually question in the face of investigative roadblocks, unique qualities endemic to an inquisitive mind that can be trained to improve an investigator's professional skill set. Each chapter discusses the applicability of the traits and requirements to the contributor's own work and experience as an investigator. In doing so, the contributors will provide valuable stories from their personal experience, which demonstrates their use or a given trait and its importance in the course of their investigative work and career.

The case examples included throughout are engaging and, as is often the case, surprising. An investigator must keep an open mind above all else and this book seeks to "lift the veil" on the inner workings of an investigation and the thought process and inner monologue of an investigator as part of that process. The book is a welcome addition to any investigator's toolkit and is also of interest to students in criminal justice, security and Homeland Security programs, security consultants, corporate and private security professionals, and the legal community.

438.      Plaintiff Komorek accepted the invitation, and on or about Jan. 1, 2022, he received Author Instructions and began crafting his chapter, titled Tenacity. Plaintiff shared the news of the invitation with Defendants LaCorte, Taplin and Hill, as well as with other professionals and colleagues both in and outside of the investigations community, including many existing clients.

439.      Plaintiff even shared rough drafts with Defendant LaCorte and sought his advice.

440.      On or about Jan. 12, 2022, Komorek received the following from one of the Editors:

> Hi Stephen!
>
> I hope this note finds you well!
>
> Bruce and I really enjoyed your chapter!
>
> Your story is truly amazing. I think our audience is really going to appreciate it and I am thankful that you shared it with all of us.
>
> It left us really wanting more!
>
> I have attached a new version with tracked changes.

If you could please take a look at the questions I've asked and either provide more information, or let me know you cannot or are unable to do so, that would be terrific.

This way, I can make sure the reader is best informed and the story flows as you intended.

Please feel free to take your time on this - no need to rush.
I have factored in the time we need, which is why I asked for the initial drafts in January.

Thank you again, so much, for your contribution!

Please let me know if you have any further questions, or if there is anything else I can do to help.

Best,
Chelsea

441.     On or about June 3, 2022, Komorek sent the Editors an updated biography for the Author section and his chapter, citing he was now the CEO of API International Consulting Group and his credentials within the Intelligence, Security and Investigations Profession.

442.     On or about May 22, 2023, Plaintiff Komorek received an email from one of the Editors, indicating they had become aware of litigation involving Komorek and Conflict International, that could "potentially bring controversy", and "And, we don't want to see any possible controversy clouding the publication of this book—for any such unresolved situation as this." As a result, the publisher declined to now include Komorek's chapter in the upcoming book and released the Plaintiff from any further obligations with regard to his submission.

443.     Another instance of tortious interference occurred while Plaintiff was actively engaged in negotiations to acquire a long standing and reputable private investigations company in the state of California, who was also a member of WAD. The purpose for the acquisition was to expand business opportunities for his business, including consulting and training services.

444.     Plaintiff had registered his business as a Foreign Corporation Authorized to Conduct Business in CA, and paid the required registration expenses and fees, and opened a satellite virtual office in Hollywood.

445.     The owner of the investigation firm abruptly ceased negotiations, including having his financial person ignoring the negotiation inquiries of the CFO of Plaintiff's business.

446.     When Plaintiff finally made contact with the owner, the owner advised he was discontinuing the proposed acquisition specifically because he had learned of the WAD complaint filed against Plaintiff by the Defendants. Upon information and belief, Conflict International, Inc., by or through its agent(s) advised the owner of the pending complaint before the Board, of which the owner was neither a member, nor privy to know the content of the complaint as a member.

447.     On at least two occasions after the WAD complaint had been filed, Plaintiff attempted to directly contact, by email, several  international WAD members he had previously referred work to in order to engage them now for potential new clients. None replied to requests to discuss the potential new cases.

448.     As a result of the non-replies, Plaintiff had to contact another WAD domestic member that he had known prior to joining WAD, to have this member on the potential new cases act as a sub-contractor to the Plaintiff, then subcontract the work to the international members.  This WAD member then reached out to the international members and without questions or hesitation they accepted the sub-contracted work.

449.     After being advised of the WAD complaint, and on August 23, 2022, being found "guilty" of only 2 of the 6 false allegations, Plaintiff was expelled from the Board of Directors

and removed from the membership directory and listserv until such time as Plaintiff could produce proof of an Ohio Private Investigators license

450.    Despite being advised by Plaintiff that he was not required to have an Ohio license, as the company was not conducting private investigations in Ohio, only non-investigative consulting and law enforcement training, the Board wrongfully and intentionally found Plaintiff "guilty" of not being licensed in Ohio and he would be expelled from membership if he failed to obtain same by Oct. 31, 2022.

451.    During this time period of suspension from membership and the listserv, Plaintiff was unable to communicate with other members, receive or make work referrals or otherwise professionally associate with members with respect to potential business relations.

452.    Despite being advised by Plaintiff he was not permitted by law and court order to disclose the litigation Defendants alleged in their 1st Complaint and said matter was dismissed with prejudice, the WAD Board wrongfully and intentionally found Plaintiff "guilty" of not disclosing the legal matter to Defendants and this was considered a violation of Ethics.

453.    The conduct of Defendant World Association of Detectives, Inc, involved intentional misconduct, fraud or a knowing violation of the law, in violation of Nevada Revised Statutes governing non-profits and previously cited above and incorporated herein as if fully rewritten.

454.    There is no privilege or justification for Defendants' conduct.

455.    As a result of the actions described above, including, without limitation, the criminal conduct and wrongful, malicious and intentional tortious conduct, Defendant Conflict International, Inc., Defendant Michael LaCorte and the other Defendants knowingly and tortuously interfered with Plaintiff's valid prospective business relations, prospective economic

advantage and prospective contracts with its prospective clients and others with whom Plaintiff and his business pursue as prospective business relationships and economic advantage.

456.     In so doing, Defendants acted with specific purpose and/or intent to harm Plaintiff and did so without proper justification, privilege or consent.

457.     The statements made, created, disseminated, transmitted or otherwise distributed by Defendants about the Plaintiff and his business were false.

458.     As a result, Plaintiff has suffered actual damages including, but not limited to, damage to Plaintiff's prospective business relations, prospective economic advantage and prospective contracts.

459.     Accordingly, Defendants'' actions constitute tortious interference with prospective business relations and economic advantage under the common law.

460.     Plaintiff has no adequate remedy at law for the foregoing  tortious interference with prospective business relations and economic advantage and criminal, wrongful, malicious and intentional conduct of the Defendants.

461.     Defendants' intentional interference with Plaintiff's prospective business relations and economic advantage  has damaged Plaintiff in an amount to be determined at trial in an amount believed to be not less than $3 million.

## **COUNT XII**

### **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

462.     The allegations set forth in paragraphs 1 through 461 of this Complaint are re-alleged as if fully re-written herein.

463.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

464.     Defendants Conflict International, Inc, Michael LaCorte and the other co-conspirator Defendants named herein, had personal knowledge that the Plaintiff is a 100% permanent and total disabled combat veteran of the US military, Army and National Guard.

465.     Defendants had personally witnessed outbursts by other Defendant LaCorte towards the Plaintiff in the past and were aware of the extreme negative and emotional impact this had on the Plaintiff and that Plaintiff had put Defendants on notice he would resign if such demeaning and outrageous actions were taken against him in the future.

466.     The criminal, wrongful, malicious and intentional actions of Defendant Conflict International, Michael LaCorte, James W. Bearden, JW Bearden and the other named Defendants as described above constitutes extreme and outrageous conduct, outrageous in its character and content, and so extreme in degree, as to go beyond all bounds of decency , an should be regarded as atrocious and utterly in tolerable in both one's personal and professional life.

467.     The criminal, wrongful, malicious and intentional actions of Defendant Conflict International, Michael LaCorte, James W. Bearden, JW Bearden and the other named Defendants as described above constitutes a deliberate and malicious campaign of harassment, intimidation and smear of reputation undertaken by the Defendants with the intent to cause, or in disregard of a substantial probability of causing, severe emotional distress.

468.     It is foreseeable that a causal connection would exist between the deliberate and malicious campaign of harassment and intimidation undertaken through criminal, wrongful, malicious and intentional actions of Defendants Conflict International, Inc, Michael LaCorte,

James W. Bearden and the other named Defendants herein and the resulting injury to Plaintiff of severe emotional distress.

469.     As a direct and proximate result of Defendants Conflict International Inc., Michael LaCorte, James W. Bearden, JW Bearden & Associates PLLC, Bearden Investigative Agency, Michael Thompson and other named Defendants herein, criminal, wrongful, malicious and intentional actions as described above Plaintiff has suffered and will continue to suffer severe emotional distress.

470.     As a direct and proximate result of Defendants Conflict International Inc., Michael LaCorte, James W. Bearden, JW Bearden & Associates PLLC, Bearden Investigative Agency, Michael Thompson and other named Defendants herein, intentional infliction of emotional distress Plaintiff has been damage in an amount to be determined at trial believed to be not less than $10 million USD.

471.     In addition to such damages, Plaintiff seeks punitive or exemplary damages as a result of the egregious nature of the intentional infliction of emotional distress committed by Defendants Conflict International, Inc., and Michael LaCorte and other named Defendants.

## COUNT XIII

### CIVIL CONSPIRACY

472.     The allegations set forth in paragraphs 1 through 471 of this Complaint are re-alleged as if fully re-written herein.

473.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

474.     Defendants Conflict International, Michael LaCorte and the other named Defendants conspired with one another to undertake the criminal, illegal, tortious, wrongful, malicious  and intentional acts and conduct complained of herein.

475.     Defendants Conflict International Inc., Michael LaCorte and the other Defendants committed numerous overt acts in furtherance of the conspiracy including, but not limited to illegally trying to obtain Plaintiff's Military Medical Records, Wire and Mail Fraud, having disgruntled current or former employees make "affidavit" style false allegations against Plaintiff in an administrative hearing knowing full well Plaintiff could not confront his accusers and properly defend himself, filing false and fraudulent claims in Federal Court against Plaintiff for the sole purpose of disparaging the Plaintiff 's reputation as a "Defendant", which has then been distributed via the media where actual and potential clients can be influenced negatively against the Plaintiff.

476.     As a direct result of the foregoing conduct, undertaken by the Defendants, Defendants have caused and continue to cause damages to the Plaintiff, including but not limited to attorney fees and costs expended, that will be expended in the future by Plaintiff to enforce his legal rights.

477.     As a direct result of the Defendants civil conspiracy Plaintiff has been damaged in an amount to be determined at trial believed to be not less than $50 million USD.

478.     Defendants' conspiracy was will and malicious and performed with evil motive and with reckless indifference to the rights of others, entitling Plaintiff to punitive damages.


## COUNT XIV

## UNREASONABLE INSTRUSION UPON SECLUSION

479.     The allegations set forth in paragraphs 1 through 478 of this Complaint are re-alleged as if fully re-written herein.

480.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

481.     Defendant Conflict International Inc and the other named Defendants herein by their actions set forth above have intentionally intruded upon the solitude or seclusion of Plaintiff and his private affairs or concerns.

482.     The named Defendants above, by virtue of the wrongful acts described in detail herein, conducted an investigation or examination into the private concerns of the Plaintiff.

483.     The methods and actions undertaken by Defendant Conflict International, Inc and the other named Defendants herein in conducting said investigation or examination into the private concerns of Plaintiff constitutes an intrusion which is highly offensive to the Plaintiff, and would so offensive to a reasonable person.

484.     As a result of Defendants Conflict International Inc, Michael LaCorte, James W. Bearden and other named Defendants unreasonable intrusion upon seclusion, Plaintiff has been damaged in amount to be determined at trial believed to be not less than $5 million USD.


## COUNT XV

## PRIMA FACIE TORT


485.     The allegations set forth in paragraphs 1 through 484 of this Complaint are re-alleged as if fully re-written herein.

486.     This Count is against Conflict International, Inc., and other Defendants, who are employed, associated with or agents of with the enterprise.

487.     Certain conduct of the Defendant Conflict International Inc, Michael LaCorte and the other named Defendants set forth above constitutes a prima facie tort, in that such conduct was intentionally undertaken to inflict harm on Plaintiff, resulting in special damages without excuse or justification, by a series of acts that would otherwise be lawful.

488.     The conduct of the Defendants Conflict International, Michael LaCorte and the other named Defendants was solely motivated by malevolence and retaliation towards Plaintiff.

489.     As a direct result of Defendants Conflict International Inc, Michael LaCorte, James W. Bearden and other named Defendants prima facie torts, Plaintiff has been damaged in amount to be determined at trial believed to be not less than $5 million USD.

## PRAYER FOR RELIEF

490.     WHEREFORE, Plaintiffs seeks damages and remedies against Defendants and prays this Court enter judgment in its favor on each and every count set forth above and award them relief including, but not limited to the following:

491.     With respect to Count I, that the Defendants be adjudged to have violated the Racketeer Influenced And Corrupt Organizations Act, Section 1962(c) and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $5 million USD., and that such damages be trebled to $15 million USD, and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

492.     With respect to Count II, that the Defendants be adjudged to have violated the Racketeer Influenced And Corrupt Organizations Act, Section 1962(c) and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $1 million USD., and that such damages be trebled to $3 million USD, and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

493.     With respect to Count III, that the Defendants be adjudged to have violated the Racketeer Influenced And Corrupt Organizations Act, Section 1962(c) and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $1 million USD., and that such damages be trebled to $3 million USD, and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

494.     With respect to Count IV, that the Defendants be adjudged to have violated the Racketeer Influenced And Corrupt Organizations Act, Section 1962(d) and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $1 million USD., and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

495.     With respect to Count V, that the Defendants be adjudged to have committed fraud and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $1million USD, and punitive damages of $2 million USD or as otherwise appropriate and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

496.    With respect to Count VI, that the Defendants be adjudged to have committed unfair competition and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $5 million USD, and punitive damages of $10 million USD or as otherwise appropriate and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

497.    With respect to Count VII, that the Defendants be adjudged to have committed trade libel and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $5 million USD and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

498.    With respect to Count VIII, that the Defendants be adjudged to have committed libel per se and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $5 million USD and punitive damages of $10 million USD or as otherwise appropriate, and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

499.    With respect to Count IX, that the Defendants be adjudged to have committed injurious falsehoods and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $5 million USD and punitive damages of $10 million USD or as otherwise appropriate, and awarded to Plaintiffs and  that Plaintiffs be awarded its costs, attorney fees and expenses.

500.    With respect to Count X, that the Defendants be adjudged to have committed tortious interference with existing business relations and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial.

501.     With respect to Count XI, that the Defendants be adjudged to have committed tortious interference with prospective business relations and economic advantage and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $3 million USD.

502.     With respect to Count XII, that the Defendants be adjudged to have committed intentional infliction of emotional distress and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $10 million USD, and punitive damages of $20 million USD or as otherwise appropriate, and awarded to Plaintiff and that Plaintiff be awarded its costs, attorney fees and expenses.

503.     With respect to Count XIII, that the Defendants be adjudged to have committed civil conspiracy and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $50 million USD, and punitive damages of $100 million USD or as otherwise appropriate, and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

504.     With respect to Count XIV, that the Defendants be adjudged to have committed unreasonable intrusion upon seclusion  and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiff's actual damages as determined at trial believed to be not less than $5 million USD, and awarded to Plaintiff and that Plaintiff be awarded its costs, attorney fees and expenses.

505.     With respect to Count XV, that the Defendants be adjudged to have committed prima facie tort  and ordering the Defendants to pay a judgment, jointly and severally in the amount of Plaintiffs' actual damages as determined at trial believed to be not less than $5 million

USD, and awarded to Plaintiffs and that Plaintiffs be awarded its costs, attorney fees and expenses.

506.     That Plaintiffs be granted prejudgment and post judgment interest; costs associated with the prosecution of this action; and such further relief as the Court may deem necessary.

## **JURY TRIAL DEMANDED**

Plaintiffs Stephen J. Komorek and API International Consulting Group, Inc., demand a jury trial with respect to all claims for relief in this Complaint triable before a jury as a matter of right.

Dated: March 15,  2024

Columbus, Ohio

By:_____/s/ William G. Knapp III_____

William G. Knapp III

Attorney at Law

2548 Blue Mountain Trail

Lyons, Colorado, 80540

Tel. Cell  937-477-4057